MATTHEW CONNELLY, a Minor, by his Parents and Next Friends, James Connelly *et al.*, Plaintiffs-Appellees, *v.* WESLEY F. GIBBS *et al.*, Defendants-Appellants.

First District (1st Division)    No. 81—2321

Opinion filed January 31, 1983.

Ancel, Glink, Diamond, Murphy & Cope, P.C., of Chicago (Marvin J. Glink and Peter D. Coblentz, of counsel), for appellants.

Canel, Aronson & Whitted, of Chicago (Richard J. Aronson and Brooke R. Whitted, of counsel), for appellees.

JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff Matthew Connelly, a 15-year-old hearing-impaired child with resultant learning disabilities, brought an action by his parents, James and Laureen Connelly, against Wesley F. Gibbs and Niles Township High School District 219, for damages and for a permanent mandatory injunction requiring that he be enrolled as a resident in the free schools of District 219. The trial court denied defendants' motion for judgment on the pleadings and severed the issue of residency for the purpose of trial, the parties stipulating that should residency be determined in favor of plaintiff, defendants had an independent legal duty to provide him with an appropriate education.

A hearing commenced on August 6, 1981, during which the court assessed the issue of residency as "blurred and complicated" by plaintiffs' ownership and dual occupancy of both a condominium in Skokie and a family residence in Chicago. Nonetheless, the court found Matthew to be a resident of Skokie and issued a permanent mandatory injunction requiring District 219 to provide him with a free and appropriate public special education. Defendants appeal the court's determination of residency and granting of injunctive relief, as well as its earlier denial of their motion for judgment on the pleadings. We disagree with the trial court's findings with respect to residency and reverse on that issue alone.

The following undisputed facts were adduced at the hearing: James and Laureen Connelly had been married for 24 years and had never been separated or divorced. They had four children besides Matthew: one son who was then living away at school, another who was married and living in San Francisco, a daughter attending college who had left home and moved in with a girlfriend one week before the hearing, and a fourth son who was planning to attend college and live in a dormitory as of the following September. The Connellys own a four-bedroom home located at 6750 North Ionia in Chicago (herein-

after referred to as the Chicago residence) and had owned that home for 15 or 16 years at the time of the hearing.

In June of 1980 Matthew had graduated from the Alexander Graham Bell Elementary School in the Chicago School District, where he had been attending a program for hearing-impaired students, and was designated by that District for placement at Whitney Young High School, a magnet school with a hearing-impaired department serving approximately 250 children from the entire city of Chicago. The Connellys were particularly concerned with the lack of vocational training at the Chicago school, however, and decided in June of 1980 that they would not send Matthew to Whitney Young. Rather, pursuant to a recommendation by the Siegel Institute of Michael Reese Hospital, the Connellys petitioned High School District 214 in Arlington Heights for Matthew's admission on a tuition basis to a regional hearing-impaired program conducted at John Hersey High School (Hersey). The Hersey program is operated by District 214 under a contract with the Low Incidence Cooperative Agreement (LICA), a joint agreement of 48 elementary and high school districts in the north and northwest suburbs of Chciago. Under the agreement, District 214 pays the cost of operating the program subject to reimbursement on a tuition basis by each of the school districts belonging to LICA that have students in the program. Defendant District 219 is also a member of LICA and any eligible hearing-impaired child who is a resident of District 219 is entitled to attend the hearing-impaired program at Hersey at no cost to them, to be paid for by the School District. The Connellys' petition for admission to Hersey was ultimately denied at a staff conference held on September 18, 1980.

Although the Connellys did not inform anyone at LICA or District 214 at the September 18 staff conference or prior thereto that they had signed a contract to purchase a condominium in Skokie in August 1980, they did indicate to at least one staff member who was present that they had more or less expected Matthew's rejection. This expectation was further evidenced by the fact that Mrs. Connelly went that same day to Niles West High School in District 219 to enroll Matthew as a resident there, requesting his placement in the program at Hersey as soon as possible. Mrs. Connelly informed the District that they were purchasing a home within its boundaries. Pursuant to this information, Matthew was scheduled to commence a program at Hersey on November 3, 1980; however, Matthew did not begin school on that date because defendants had received information that the Connelly family had not, in fact, moved to Skokie. Defendants were so notified by Louise Wilson, an employee of District 214 and teaching consultant

at Hersey. Wilson telephoned Mrs. Connelly at the Chicago residence on October 22 to find that Mrs. Connelly had not moved out of Chicago and had no present intentions to do so. Rather, Mrs. Connelly explained to Wilson that her husband and Matthew would live in the Skokie condominium during the week, returning to the Chicago residence to share dinner with Mrs. Connelly and the rest of the family, and would reside at the Chicago residence only on weekends. Based on this information, it was determined that plaintiffs failed to meet the residency requirements of District 219 and the Connellys were so advised on October 31, 1980.

On November 3, the Connellys met with Rita Stewart of District 219 to discuss the question of their residency. At that time, Mr. Connelly produced his Skokie phone bill, an insurance policy on the condominium and a Skokie voter's registration card. The Connellys explained to Stewart that they wanted the best education available for Matthew, which they did not feel was possible in their present district. In response to Stewart's questioning as to why they had not moved the entire family into District 219, the Connellys responded that, due to the currently depressed housing market, it seemed unadvisable to try to sell the Chicago residence at that time, and also that they felt it would be unfair to their other children to uproot them from their home and friends. The Connellys were told that the matter would be taken "under advisement." They allege that no further investigation was in fact undertaken by defendants before plaintiffs instituted the present action.

In addition to the facts thus stated, it was established at the hearing that during the summer of 1980, while their petition for tuition placement in District 214 was still pending, the Connellys began looking for a house to purchase in the suburbs of Lincolnwood, Skokie and Morton Grove, all of which fall within District 219, and in Arlington Heights. The Connellys looked at eight to 12 houses with two or three bedrooms, all in the $150,000 range. The Connellys never made an offer to purchase a single-family house, however, and although they had two appraisals on their Chicago residence, they never went so far as to list that house for sale with a broker because they felt the appraised value was below what it should be. Nor did they at any time consider renting a house which would accommodate the entire family, because, as Mr. Connelly testified, it did not suit their personal lifestyle.

Having rejected the idea of selling the Chicago residence and purchasing a new single-family residence, the Connellys began looking at one-bedroom condominiums in the same area and in August 1980, af-

ter having viewed three or four, signed a contract to purchase a four-room, one bedroom, condominium at 8521 Lotus in Skokie. The family's Chicago residence is within walking distance of Mr. Connelly's place of employment, while the Skokie condominium is slightly farther, but within a few minutes of driving time. The Connellys paid $40,000 cash for the condominium for which they closed in October of 1980, and claim that James, Laureen and Matthew have lived there and have been residents of Skokie and District 219 since that time.

In addition to utility bills and an insurance policy on the Skokie condominium and his voter registration card, Mr. Connelly produced a vehicle registration sticker, library card and income tax returns, all indicating the Skokie address. The Connellys also showed evidence of membership in the condominium association, had attended at least one semi-annual association meeting and Mr. Connelly had participated in some cooperative painting of the common areas. Mrs. Connelly, on the other hand, remained registered to vote in Chicago and had voted there in the most recent elections. The Connelly family also owned two cars which were registered to the Chicago address. The Connellys introduced the testimony of a neighbor at the condominium who had seen Mr. Connelly and Matthew approximately 40 times over the preceding 11-month period and had seen Mrs. Connelly there four or five times. The witness did not recall seeing Matthew separately on any of those occasions.

■■ The general rule in Illinois is that the residence of parents is the residence of their children. (*Ashley v. Board of Education* (1916), 275 Ill. 274, 114 N.E. 20; *Turner v. Board of Education* (1973), 54 Ill. 2d 68, 294 N.E.2d 264.) *Ashley* also made clear that the "residence" required for school purposes "*** is not such as would be required to establish the right to vote ***" and that a residence, even for a temporary purpose, in a school district is sufficient to entitle children of school age to attend school, so long as the residence is not established solely to enjoy the benefits of free schools. (*Ashley v. Board of Education* (1916), 275 Ill. 274, 278.) Conversely, a minor child's dwelling in a school district solely for the purpose of attending public school in the district will not be considered residency in the district for school purposes. (*Turner v. Board of Education* (1973), 54 Ill. 2d 68, 72; *Dean v. Board of Education* (1944), 386 Ill. 156, 53 N.E.2d 875.) As stated in *Ashley*, "[t]he removal of a portion of a family from the legal domicile to another district in order to send to the free schools thereof does not confer the right to do so." *Ashley v. Board of Education* (1916), 275 Ill. 274, 279.

Based on the physical exhibits and testimony, the trial court con-

cluded that the Connellys were residents of District 219 and, therefore, that Matthew was also a resident of District 219 for school purposes. The court also found that the Connellys had not established a dwelling in Skokie solely for the purpose of enjoying the benefits of a free public education in District 219, but had satisfactorily demonstrated "*** other valid reasons for seeking to establish Skokie as the current and future permanent home of their son Matthew and for themselves ***."

Our courts have long held intent to be the critical question in determining residence, and in determining intent a person's acts are to be given more weight than his declarations. (*Miller v. Police Board* (1976), 38 Ill. App. 3d 894, 898, 349 N.E.2d 544, *appeal denied* (1976), 63 Ill. 2d 557; *Stein v. County Board* (1968), 40 Ill. 2d 477, 240 N.E.2d 668.) Plaintiff in *Miller* was a police lieutenant who was charged with violating certain rules of the Chicago Police Department, including a rule requiring all officers to reside within the corporate boundaries of the City. Although Miller had maintained an apartment in Chicago for three years, his wife and children lived in the suburb of Villa Park. As in this case, plaintiff was not divorced or separated, but claimed, as do the Connellys, that he spent four or five nights a week at the Chicago apartment and two or three nights a week with his family in Villa Park. Miller, like Mr. Connelly, also spent his days off at the family residence, working to maintain the premises. As proof of residency, Miller produced substantially the same physical exhibits as did plaintiffs here. The court, in *Miller*, reasoned that "residence" is established by physical presence and the intent to make that location a permanent residence, concluding that "*** a person may not have a permanent residence in two places at the same time." (38 Ill. App. 3d 894, 897-98.) In finding that Miller was a resident of Villa Park and not of Chicago, the court also placed a significant reliance on the marital and family relationship, stating that "[i]t would be unusual for a family man, not separated or divorced, to have a separate permanent residence from his family." 38 Ill. App. 3d 894, 898.

■ In light of the rationale set forth in *Miller*, we conclude that the trial court's finding that James, Laureen and Matthew Connelly were permanent residents of Skokie was against the manifest weight of the evidence. There is no question but that at the time the Connellys purchased the four-room condominium in Skokie they did not intend that their entire family, or even those remaining at home, would reside there, as such would have been physically impossible. In fact, from the time the Connellys took possession up until the date of hear-

ing, only one Connelly child other than Matthew had stayed overnight in Skokie and had done so on no more than two occasions. The Connellys freely admitted that the Chicago residence continued to serve as a "home base" for all of the children when they got together during vacations and on holidays. On those occasions when Mr. Connelly and Matthew did stay overnight in Skokie, Mr. Connelly would drive Matthew to the Chicago residence the following morning and the two would often have breakfast there. Before leaving the Skokie condominium, Mr. Connelly would program a call-forwarding feature so that phone calls made to the Skokie number during the day would be received at the Chicago residence. Matthew would spend the remainder of the day in Chicago, where he could be supervised by Mrs. Connelly or another family member. After work, Mr. Connelly would return to Chicago, where he and Matthew would share dinner with the rest of the family before returning to Skokie to sleep. Since October of 1980, Mrs. Connelly had spent most of her time in Chicago, visiting the Skokie condominium or sleeping there on an average of one or two times a week. The Connellys claimed four of their children as dependents on their 1980 Federal income tax return and Mr. Connelly testified that he still exercised parental control over the two younger children who resided in Chicago during the time he and his wife claimed to be permanent residents of Skokie. We believe plaintiffs' acts evidenced an intent, contrary to their declared intent, to retain their permanent residence in Chicago.

The sole question before us, therefore, is whether plaintiffs can establish a second residence in another district, so long as they offer any justification other than education for the temporary residence, and thereby gain a tuition-free education in the second district.

Plaintiffs seek to rely on a line of residency cases which stand for the proposition that a child's right to attend school is not limited to the place of his parents' residence or of legal domicile, as long as the child is not residing in the new district solely for the purpose of attending school there (*Ashley v. Board of Education* (1916), 275 Ill. 274; *Turner v. Board of Education* (1973), 54 Ill. 2d 68), and that as long as the residence in which a child lives has a "degree of permanency" about it, the child can attend a free school in the district of that residence. *Dean v. Board of Education* (1944), 386 Ill. 156.

■ In addition to their acknowledged desire to provide Matthew with a quality program which included vocational training, plaintiffs testified as to several other reasons which, they claim, precipitated their purchase of the Skokie condominium. These justifications, which were accepted by the trial court, included their desire to help Mat-

thew learn daily living skills and to become "an independent and productive member of society," to enable Matthew to foster after-school relationships with other hearing-impaired children and to develop a closer father-son relationship between Matthew and Mr. Connelly. All of the evidence, however, reveals that Matthew was never left alone for any period of time at the Skokie residence and that he continued to take the majority of his meals with other family members in the Chicago home. Further, there is nothing in the record to suggest that the move to Skokie would enhance the development of the types of relationships which the Connellys purportedly sought for Matthew. The remaining justification given by plaintiffs for purchasing the Skokie condominium—to be as close to Mr. Connelly's place of employment as the Chicago residence—indicates at best a reason for purchasing this particular condominium, as opposed to some other one. Having reviewed the record, we cannot escape the conclusion that the true motivating factor for the Connellys' purchase of the Skokie condominium was to provide their handicapped son with what they perceived to be the best education possible. This case also differs significantly from those cases cited by plaintiffs in which the presumption of school residency being the same as the primary parental residence was overcome. Both *Ashley* and *Dean* involved the relinquishment of parental care, custody and control. In contrast, plaintiffs here maintain the care and custody of one child living in Skokie, while at the same time maintaining care and custody of their other children who continue to live in Chicago. While it is an accepted proposition that a second parental residence may be established temporarily for school purposes where, according to the exigencies of interests, a parent and child are removed for long intervals from their true residence, we find no justification for upholding the establishment of a second parental residence for school purposes which is only minutes away from the true parental residence. We believe this to be precisely the type of conduct condemned by our supreme court in *Ashley*. See *Ashley v. Board of Education* (1916), 275 Ill. 274.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause is remanded with directions to dissolve the permanent mandatory injunction and to dismiss the suit with prejudice.

Reversed and remanded with directions.

GOLDBERG and CAMPBELL, JJ., concur.