ANDRA MINA, a Minor, by Her Mother and Next Friend Mihaela Anghel, Petitioner-Appellee and Cross-Appellant, v. THE BOARD OF EDUCATION FOR HOMEWOOD-FLOSSMOOR, Community High School District 233, Cook County, *et al.*, Respondents-Appellants and Cross-Appellees.

First District (6th Division)   No. 1—03—1532

Opinion filed April 23, 2004.

James P. Bartley and James G. Wargo, both of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellants.

William J. Borah, of William J. Borah & Associates, of Homewood, for appellee.

JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Respondents-appellants the Board of Education for Homewood-Flossmoor, Community High School District 233, Laura Murray, Lee Gaus and E. Von Mansfield (collectively, Board) appeal the trial court's reversal of its decision finding that petitioner-appellee Andra Mina (Andra), by her mother and next friend Mihaela Anghel, was not a resident of school district 233 and owed $5,901.15 in tuition fees for her attendance of Homewood-Flossmoor High School. In addition, cross-appellant Andra appeals from the trial court's concurrent holding that she was not entitled to sanctions against cross-appellee Board. For the following reasons, we reverse the trial court's decision in part and affirm in part.

## BACKGROUND

Andra was enrolled in school district 233 and attended Homewood-Flossmoor High School (high school). In August 2001, at the beginning of the 2001-02 school year, Andra lived in a rented apartment with her mother Mihaela Anghel and her stepfather Marian Anghel at 749 Elm Street in Flossmoor, inside the boundaries of district 233. Ac-

cordingly, Andra attended the high school tuition-free as a resident of the district. Andra used the Flossmoor address as her residence on her high school registration form for that year.

In November 2001, assistant principal Pamela Allen-Tucker noticed that mail the high school had sent to Andra and her parents at the Flossmoor apartment was being returned with a forwarding address of 1407 Pinewoods Court in University Park, a location outside the boundaries of district 233. Allen-Tucker was also informed by one of Andra's teachers that Andra was seen being driven to school in the mornings by her mother from outside the district. In August 2002, with the beginning of the 2002-03 school year, Andra's registration form again stated that her residence was the Flossmoor apartment. Allen-Tucker began an investigation into Andra's residency status, and in November 2002, the school district notified her parents that it had determined that Andra was not a resident of the district and could no longer attend the high school tuition-free. Mihaela Anghel requested a hearing on Andra's residency status, which was held on December 12, 2002.

Marian Anghel testified before the hearing officer that he, Mihaela and Andra lived at the Flossmoor apartment when Andra began the 2001-02 school year. In September 2001, they began negotiations with a bank for the sale and purchase of a house in foreclosure. This house was located at 328 Serena Drive in Chicago Heights, within school district 233. Marian testified that at the same time, the family also entered into a contract for the sale and purchase of the house in University Park. That house was situated on top of a hill surrounded by two to three acres of forest, and was located outside the boundaries of the school district. Sale of the University Park home was completed without any problem and the Anghels closed on that property in September 2001.

Marian further testified that with respect to the Chicago Heights home, title problems were encountered and the Anghels' purchase of that property was delayed. However, the Anghels had already terminated their lease on the Flossmoor apartment in September 2001 and were required to vacate the premises no later than November 2001. The Anghels moved into the University Park home in November 2001. In December 2001, the Anghels finally signed a contract for the purchase of the Chicago Heights home and the closing occurred in February 2002. The Anghels did not move into the Chicago Heights home, however, because it was not habitable and local authorities would not issue an occupancy permit. Marian testified that during the next months, he, Mihaela and Andra "rehabbed" the home, but did not sleep there because there was no place in the home to do so. They

paid real estate taxes, as well as the utility, gas and electric bills, on both the University Park and Chicago Heights homes. As of the hearing (December 2002), Marian had not yet received a final occupancy permit for the Chicago Heights home. He testified that his intent in purchasing the University Park home was for vacation, and his intent in purchasing the Chicago Heights home was "to move in and reside in [the district] until Andra finishes school."

Mihaela Anghel testified briefly that her intent in purchasing the Chicago Heights property was to live there as her home since it was located only five minutes from where she and her husband worked, and that her intent in purchasing the University Park property was for vacation purposes. She admitted that she moved to University Park with Andra when they left the Flossmoor apartment and found that they could not live at the Chicago Heights property because it was not habitable. She confirmed Marian's testimony that there was nowhere to sleep there and stated that she took Andra back and forth to school from the University Park home because that is where Andra did her homework and kept her computer and other belongings. When asked where the family lived between the start of the 2002-03 school year and the time of the hearing, Mihaela testified that they did not live "physically in just one place."

Jean Thompson, the Anghels' real estate broker, testified that she facilitated the sale of both the Chicago Heights and University Park homes to the Anghels. Thompson stated that the Anghels told her they wanted the Chicago Heights home to "rehab" for their own use and to stay in the district for Andra's sake, and the University Park home for recreation.

Assistant principal Allen-Tucker testified that she was alerted to Andra's residency issues during the 2001-02 school year, when mail sent to her Flossmoor address within the district was being returned to the school unopened with a forwarding address in University Park, outside the district. The Flossmoor address was listed as Andra's residence on both her 2001-02 and 2002-03 school registration forms, at the beginning of each school year. Allen-Tucker testified that the last time the school had sent mail to Andra at the Flossmoor address, which was then returned with the University Park forwarding address, occurred right before the hearing in December 2002.

Jim Blackman, Andra's driver's education teacher at the high school for the 2002-03 school year, testified that he became curious about Andra's residency on the first day of school in August 2002. As part of his course, Andra was required to fill out a permanent record card. She filled out the card, but did not write an address in the space provided for her residence. Blackman also noticed that the phone

number Andra listed on the card came from an area outside the district. When Blackman questioned Andra about the card, she told him that her family was living in University Park and was trying to purchase a home in Chicago Heights. Blackman also testified that on three separate occasions on his way to and from the school, he saw Andra being driven by her mother from outside the district: twice in the morning before classes he followed them to the school from outside district boundaries, and once in the afternoon after school he followed them as they left the school and district boundaries.

Mike Flagg, the district's residency investigator, testified that he was called to investigate Andra's residency status by the high school soon after the start of the 2002-03 school year. On several different occasions at different times of the day, he went to the three addresses in question (the Flossmoor apartment, the Chicago Heights home and the University Park home) and recorded his observations in a log which he submitted at the hearing. Flagg testified that he went to the Flossmoor apartment in the morning before school on September 4, 9, and 13, 2002, and Andra never appeared. He rang the doorbell of the apartment on the evening of September 20, 2002, and no one answered. He went to the Chicago Heights home on the mornings of September 23, October 28, and November 13, 2002. He observed that the house was empty, no one answered the door and it looked like it was being "rehabbed." Flagg had taken pictures of the home and submitted them to the hearing officer. He also went to the home on the evening of November 25, 2002, and saw a white car registered to Andra's parents in the driveway; the "rehab" looked finished but no one answered the door when he knocked. Flagg testified that he went to the University Park home on the mornings of September 26, October 1, 7, 11, 22, 30 and November 4, 2002, and the evening of October 18, 2002. Each of these mornings, he saw Andra come out of the home with her mother and followed them as they drove from University Park to the high school. In the evening (as well as on several mornings), he saw two cars parked in the driveway, both of which were registered to Andra's parents. Flagg further testified that he showed Andra's picture to the school bus driver of the route Andra was scheduled to be on, and the bus driver stated he had never seen her before and she had not ridden the bus that school year. Flagg stated that the school administration received a telephone call from a community member who told them no one was living at the Chicago Heights home. Based on his observations and all the information he obtained, it was Flagg's conclusion that Andra was residing at the University Park home.

At the conclusion of the hearing, the hearing officer issued a

lengthy decision, reviewing all of the testimony given, the witnesses' credibility and the exhibits presented. In discussing Marian's and Mihaela's testimony regarding their intent in purchasing the two homes, the hearing officer noted that one cannot establish a residence in a place where he has never resided and then argue residence as a result of an intention to become a resident in the future. In her findings, the hearing officer stated that the Anghels' purchase of the Chicago Heights home was solely for the purpose of allowing Andra to attend the high school, which was insufficient to establish residency in the district for the purpose of attending the high school tuition-free. Despite what the Anghels stated was their intent, the Chicago Heights home was not their residence; rather, the family had been living at the University Park home for some time. The hearing officer noted that according to the Illinois School Code (School Code) (105 ILCS 5/10—20.12b(a)(2)(v) (West 2002)), in order for Andra to attend the high school tuition-free for the 2002-03 school year, the burden was on Mihaela as Andra's mother and legal custodian to demonstrate that Andra's "regular fixed night-time abode for purposes other than to have access to the educational programs of the district" was within the district. The hearing officer determined that "[t]his has not been accomplished" since there was "no physical presence observed [at the Chicago Heights home], and certainly not presence of a regular or continual nature, other than to work on the property." Rather, the hearing officer found that Andra's primary residence was the University Park home, and while the Anghels may have intended to return to the district, they presented evidence regarding only their future plans, and this alone did not establish residency. The hearing officer concluded that the evidence proved Andra did not reside within the boundaries of the district and had not done so since November 2001 until at least the time of the hearing in December 2002.

Mihaela Anghel filed objections to the hearing officer's determination with the Board. Upon review, the Board approved the hearing officer's findings and conclusion that Andra was not a resident of the school district between November 2001 and December 2002. The Board sent a letter to the Anghels stating its decision, determining the amount of tuition owed for this period to be $16,628.62, and declaring that pursuant to the School Code Andra could no longer attend the high school effective January 22, 2003 (105 ILCS 5/10—20.12b(d) (West 2002)). On January 27, 2003, Mihaela filed a petition for writ of *certiorari* and injunctive relief in the trial court, seeking reversal of the Board's decision, Andra's readmittance to the school, and attorney fees and costs. Mihaela also pointed out that section 10—20.12a of the School Code states that district-resident students who become

nonresidents during a school term are not to be charged tuition for the remainder of the term in which they became nonresidents (105 ILCS 5/10—20.12a (West 2002)). In response, the Board readmitted Andra, stipulating that as of January 2003 she was a current resident of the district living in the Chicago Heights home, and conceded that it could not charge tuition for the 2001-02 school year since Andra became a nonresident only in November 2001; accordingly, the Board modified its accounting of tuition owed to $5,901.15, encompassing only the beginning of the 2002-03 school year (August 2002 to January 2003). In reply, Mihaela asked the trial court for sanctions against the Board, pursuant to Illinois Supreme Court Rule 137 (155 Ill. 2d R. 137).

Upon review, the trial court stated that there was no dispute that residency is established by both physical presence in a location and the intent to make that particular location a permanent residence. However, the court concluded that the hearing officer "erred in her application of the law of residency to the given state of facts and her decision was clearly erroneous." The court found that the hearing officer erred in "not applying or inconsistently applying the issue of intent" because, while admitting that there was sufficient evidence of the Anghels' intent to establish residency within the district so Andra could attend the high school, the hearing officer "based her decision solely on the fact that [Andra] did not reside within the district boundaries." In addition, the trial court denied Mihaela's request for attorney fees and costs and found that Rule 137 sanctions were "not appropriate herein."

## ANALYSIS

### I. Hearing Officer's Findings on Residency

We first discuss the underlying appeal in this cause regarding the hearing officer's findings and conclusions with respect to Andra's residency. Because the Board has conceded that Andra lived in the district (in the Flossmoor apartment) at the start of the 2001-02 school year and that it thus cannot charge the Anghels for that school year's tuition, we focus our review primarily on the period of time between August 2002 (the start of the 2002-03 school year) and December 2002/January 2003 (the hearing and the Board's stipulation that Andra is currently a resident of the district living in the Chicago Heights home). The Board contends that the hearing officer's determination that Andra was not a resident of the district at this time was not against the manifest weight of the evidence and that the hearing officer properly applied the law of residency in reaching her decision. To the contrary, Mihaela, on behalf of Andra, contends that the hearing

officer's decision was clearly erroneous since the hearing officer found that the lack of physical presence within the district necessarily meant the lack of residency therein even though the Anghels' intent, which they stated was to always remain in the district, is the primary factor controlling residency. We agree with the Board.

As a threshold matter, we note the subtle discrepancies in the parties' positions as to the applicable standard of review in this cause. The Board alerts us to the general proposition that an agency's factual findings are deemed *prima facie* true and correct, and accordingly, our review of the agency's decision should be according to a manifest weight standard. Mihaela, in contrast, asserts that we are presented on appeal with a mixed question of law and fact, *i.e.*, whether the hearing officer properly applied the law of residency to the facts of the instant case, and thus, our review must follow the clearly erroneous standard.

■ It is well established that under the Administrative Review Law, we review the final decision of the administrative agency (*i.e.*, the hearing officer) and not the decision of the trial court. See 735 ILCS 5/3—101 *et seq.* (West 1998). The Board is correct in stating that the hearing officer's findings of fact are deemed *prima facie* true and will not be reversed unless they are against the manifest weight of the evidence, while her conclusions of law merit less deference. See *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204-05 (1998). However, our supreme court has repeatedly recognized that not every issue can clearly be categorized as solely a question of fact or a question of law. See *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 391 (2001); *Belvidere*, 181 Ill. 2d at 205. Rather, some issues combine aspects of both categories, involving an "examination of the legal effect of a given set of facts." *Belvidere*, 181 Ill. 2d at 205. Such issues present mixed questions of law and fact. See *Belvidere*, 181 Ill. 2d at 205. The classic characterization of questions in this category is one in which the underlying facts are established and undisputed, the applicable rule of law is uncontested, and the remaining issue " 'is whether the facts satisfy the statutory standard, or *** whether the rule of law as applied to the established facts is or is not violated.' " *AFM*, 198 Ill. 2d at 391, quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19, 72 L. Ed. 2d 66, 80 n.19, 102 S. Ct. 1781, 1790 n.19 (1982).

It is our view that the issue presented in the instant case represents a mixed question of law and fact. The hearing officer's finding is factual in that it involved a determination of whether the facts with respect to the Anghels' activities during the time in question supported the conclusion that Andra was indeed a resident of the

school district for purposes of attending the high school on a tuition-free basis. Yet, the hearing officer's finding may also be characterized as involving a question of law because it applied the rules of law regarding residency to assess Andra's status as a nonresident of the district; the trial court concluded, and Mihaela echoes on appeal, that the hearing officer misapplied these rules to the established facts. See *AFM*, 198 Ill. 2d at 391-92. Consequently, we employ a clearly erroneous standard of review in the instant case, and note, accordingly, that a decision rendered by the hearing officer or the Board is clearly erroneous only when, based on the entire record, we are left with the " 'definite and firm conviction that a mistake has been committed.' " *AFM*, 198 Ill. 2d at 393, quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 2d 746, 766, 68 S. Ct. 525, 542 (1948).

Ultimately, however, even were we to conduct our review under the manifest weight standard, the outcome would be the same. Under either standard, if there is any evidence in the record to support the decision of the hearing officer, that decision must be affirmed. See *Swoope v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 323 Ill. App. 3d 526, 529 (2001) (this principle applies to clearly erroneous standard); *Finnerty v. Personnel Board*, 303 Ill. App. 3d 1, 8 (1999) (this principle applies to manifest weight standard). This is because, regardless of either standard, we must give significant deference to the hearing officer's determinations with respect to the facts presented, due to the officer's unqualified expertise and experience in these matters. See *Swoope*, 323 Ill. App. 3d at 529; *Finnerty*, 303 Ill. App. 3d at 8.

■ Turning to the merits, we begin with a discussion of those statutory sections of the School Code that predominate the instant cause. "[O]nly resident pupils of a school district may attend the schools of the district without payment of *** tuition." 105 ILCS 5/10—20.12b(b) (West 2002). Under section 10—20.12b(a), a student's residence is the residence of the person who has "legal custody" of the student. Subsection (a)(2) of that section gives five alternative definitions of "legal custody," the operative one[1] here being:

"(v) Custody exercised by an adult who demonstrates that, in fact, he or she has assumed and exercises legal responsibility for the pupil and provides the pupil with a regular fixed night-time abode for purposes other than to have access to the educational programs of the district." 105 ILCS 5/10—20.12b(a)(2)(v) (West 2002).

---

[1]Subsections (a)(2)(i) through (a)(2)(iv) do not apply to the instant case, as there is no question regarding Andra's guardianship; Mihaela is Andra's biological mother and legal guardian.

From this, it is clear that Andra's residence is tied to that of her mother Mihaela and to the place where Mihaela provides Andra with a regular, fixed nighttime abode. In addition, this fixed and regular abode cannot be created solely to allow for Andra to have access to district 233's educational programs but, rather, must explicitly be established for purposes other than this end. See 105 ILCS 5/10— 20.12b(a)(2)(v) (West 2002).

■ Our case law involving residency for purposes of school attendance has historically followed these same principles. First we note that with respect to residency in general, our courts have held that there are two elements that must be met; that is, in order to have one's residence in a certain place, she must both establish a physical presence there and have the intent to make that location her permanent residence. See *Miller v. Police Board*, 38 Ill. App. 3d 894, 898 (1976). Our courts have further concluded that because the person's residence is to be her permanent abode or home, she may not have a residence in two places at the same time. See *Miller*, 38 Ill. App. 3d at 897-98.

■ The issue of whether a particular student is a resident of a school district for the purposes of attending that district's school(s) tuition-free is not a novel one to our legal system. In fact, our state supreme court historically delineated a residency rule in this regard that is still the applicable rule today. See *Ashley v. Board of Education*, 275 Ill. 274, 279 (1916); *Connelly v. Gibbs*, 112 Ill. App. 3d 257, 261 (1983) (applying the rules set forth in *Ashley*). This rule makes clear that a residence, even for a temporary purpose, in a school district is sufficient to entitle children of school age to attend school, so long as the residence is not established solely to enjoy the benefits of free schools. See *Ashley*, 275 Ill. at 279 (" '[t]he mere temporary residence of a family in a district, solely to enjoy the benefits of the free schools and with the intention of removal as soon as that purpose is accomplished, does not entitle the children to the privileges of said schools,' " quoting Bateman's Common School Decisions 135 (1890)). In other words, even a temporary residence within the school district would entitle a child to attend a school in that district tuition-free, as long as the residence was not established for that single purpose. See *Logsdon v. Jones*, 311 Ill. 425, 426-27 (1924) (reviewing and applying the rule in *Ashley*); accord *Connelly*, 112 Ill. App. 3d at 261. Conversely, then, residing in the school district "solely for the purpose of attending public school in the district will not be considered residency in the district for school purposes" and, thus, does not entitle a student to attend the district's schools tuition-free. *Connelly*, 112 Ill. App. 3d at 261; see also *Turner v. Board of Education, North Chicago Community*

*High School District 123*, 54 Ill. 2d 68, 72 (1973); *Logsdon*, 311 Ill. at 427; *Ashley*, 275 Ill. at 279; *People ex rel. Saxe v. Board of Education*, 206 Ill. App. 381, 383 (1917) (all stating same).

It cannot be denied, as Mihaela points out, that intent is an important element in determining residency, for even our review requires an examination of the Anghels' intent during the time period in question with respect to their residency: Did they intend the University Park property located outside district 233 or the Chicago Heights property located inside district 233 to be their permanent, fixed and regular abode? In determining intent, a person's acts are to be given more weight than her declarations. See *Connelly*, 112 Ill. App. 3d at 262 (acts evidencing intent of residency may supercede party's declared intent); accord *Miller*, 38 Ill. App. 3d at 898. Even in reviewing these acts, however, it must also be remembered that, contrary to Mihaela's assertions, intent alone does not establish residency; rather, as noted earlier, it is intent and one's physical presence *combined* that solidify one's residence in a certain location. See *Connelly*, 112 Ill. App. 3d at 262; *Miller*, 38 Ill. App. 3d at 898.

Based on the these legal principles, as well as the facts contained in the record before us, we conclude that the hearing officer's finding that the Anghels resided in the University Park home during the time in question, and thus, that Andra was not a resident of the school district and could not attend the high school tuition-free, was in all respects proper and that the trial court's reversal was in error. The Anghels' acts during the time in question clearly evidenced that they were residents of University Park, not Chicago Heights. Since the middle of the 2001-02 school year, mail sent by the school to the Anghels' Flossmoor apartment was being returned with University Park as a forwarding address. This continued into the beginning of the 2002-03 school year, and even until the residency hearing which took place in December 2002. Obviously, the Anghels were not receiving their daily mail at any address within the district. On the first day of the 2002-03 school year, Andra refused to write her address on her permanent record card and provided her teacher Blackman with a phone number from outside district boundaries. She also admitted to him that her family was currently living in University Park and had not yet purchased a home in Chicago Heights. Blackman saw Mihaela drive Andra to and from the school on three separate occasions from outside the district. Investigator Flagg observed the Flossmoor apartment and both the Chicago Heights and University Park homes at various times on various days of the week over a three-month period at the beginning of the 2002-03 school year. His logs indicate that he never saw the Anghels at the Flossmoor apartment, which was the ad-

dress listed on Andra's school registration forms. Likewise, he observed the Chicago Heights house being "rehabbed," but again never saw Andra leave from there or return there on her way to or from the high school. In contrast, on several different mornings, he saw Andra and Mihaela leave the University Park home and drive to the high school, where Mihaela dropped Andra off. At night, Flagg saw the Anghels' vehicles parked in the driveway of that property.

Perhaps even more significant is the testimony of the Anghels themselves, the credibility of which was for the hearing officer to evaluate. See *Yeksigian v. City of Chicago*, 231 Ill. App. 3d 307, 311 (1992) (decisions with respect to witness credibility during administrative hearing is for hearing officer only). First, discrepancies existed in the declared intent of Mihaela and Marian with respect to their purchase of the Chicago Heights home. Mihaela testified that the family's intent in purchasing that property was to live there as their home since it was located close to where Mihaela and Marian worked. Marian, however, testified that the family's intent in purchasing the Chicago Heights home was to live in the district until Andra finished school, thereby indicating that the family contemplated leaving the district once that was accomplished. Real estate broker Thompson corroborated Marian's testimony, as she testified that the Anghels told her they wanted the Chicago Heights home so they could stay in the district for Andra's sake. In addition, although the Anghels may have begun contract negotiations to purchase the Chicago Heights home before completing their purchase of the University Park home and paid taxes and utility bills on both properties, it is undisputed that they terminated their lease on the Flossmoor apartment within the district in September 2001 and at the time of the hearing (more than a year later) had yet to receive a final occupancy permit for the Chicago Heights home. During this entire time, which encompassed the start of a new school year, the Anghels had no physical presence within the district. Both Marian and Mihaela testified that the family did not sleep in the Chicago Heights home. As Mihaela admitted, Andra did her homework and kept her belongings at the University Park home, and was driven to and from the high school from that home, not from Chicago Heights.

In her brief on appeal, Mihaela relies heavily on *Kreitz v. Behrensmeyer*, 125 Ill. 141 (1888), for her proposition that the Anghels' "temporary" absence from their residence within the district did not cause them to lose their residency status because they at all times intended to return and never intended to permanently abandon the district as their permanent residence. However, *Kreitz* (as well as *Stein v. County Board of School Trustees*, 40 Ill. 2d 477 (1968), and

*Dillavou v. County Officers Electoral Board*, 260 Ill. App. 3d 127 (1994), which rely on *Kreitz* and which Mihaela also cites) is inapposite to the instant case. *Kreitz* (as do *Stein* and *Dillavou*) involves residency in relation to voting and election rights, and our supreme court has held that residency as required to establish the right to vote is not comparable to residency as it relates to the attendance of school in a district on a tuition-free basis. See *Logsdon*, 311 Ill. at 427; accord *Ashley*, 275 Ill. at 278. Moreover, even if *Kreitz* were applicable, while it does stand for the proposition Mihaela cites, Mihaela ignores other relevant principles bearing on that proposition. Specifically, the *Kreitz* court noted that leaving a residence may not necessarily mean an abandonment of that residence; yet, it also acknowledged that certain factors may indeed signify such. That court provided the example of a person who removes his family from one district to another, builds a home and keeps his property there, returns there upon his leisure time, and remains there when sick or unemployed. Notwithstanding that he may "be employed in labor in another district, and claim that to be his residence" (*Kreitz*, 125 Ill. at 195), the person's true, permanent and only residence is the former. *Kreitz*, 125 Ill. at 196 ("[t]here must be a present continuous citizenship, with its attendant incidents and rights, subject, of course, to certain necessary guards against fraud"; where one claims *and exercises* these is his residence).

*Connelly v. Gibbs*, 112 Ill. App. 3d 257, provides relevant insight into residency as it relates to school attendance, and we find it to be quite instructional here. In *Connelly*, a student, his parents and four siblings lived in a home in Chicago. The student, who was hearing-impaired, attended elementary school in a Chicago school district and was scheduled to begin high school in that same district. The student's parents, however, were concerned with the lack of hearing-impaired programs at the high school in that district and sought admission to a district in the northwest suburbs which had such programs, but were denied. The parents bought a condominium in Skokie, outside the Chicago school district, and enrolled the student there—a district that had a liaison relationship with the suburban hearing-impaired programs. During a hearing on the student's residency, the family insisted that the student's residence was in Skokie, since the student and his father lived in the condominium during the week and returned to the Chicago residence only on the weekends, where the mother and other children lived. The parents presented phone bills, a library card, a vehicle registration sticker, income tax returns, an insurance policy on the condominium, and a voter's registration card from Skokie as proof of their residence there, as well as the fact that the Skokie address was near the father's employment. The trial court found that

the student was a resident of Skokie and thus could enter the high school tuition-free.

However, the reviewing court reversed, holding that the trial court's finding was erroneous. See *Connelly*, 112 Ill. App. 3d at 262. The *Connelly* court noted that there was "no question but that" the family's acts "evidenced an intent, contrary to their declared intent, to retain their permanent residence in Chicago"; the Chicago home was the family's " 'home base' "; the father would transfer telephone calls received in Skokie to the Chicago home; and the student and father spent nights at the Chicago home. Even when they did not, the father and student would drive from Skokie to Chicago to have breakfast in the morning there, the student spent the afternoons in Chicago after school to be supervised by his mother, and the father would return from work to the Chicago home to eat dinner before accompanying the student to Skokie to sleep. *Connelly*, 112 Ill. App. 3d at 262-63. From these facts, the *Connelly* court held that it could not "escape the conclusion that the true motivating factor for [their] purchase of the Skokie condominium was to provide their *** son with what they perceived to be the best education possible." *Connelly*, 112 Ill. App. 3d at 264. While this may be admirable, the *Connelly* court declared it to be "precisely the type of conduct condemned by our supreme court in *Ashley*." *Connelly*, 112 Ill. App. 3d at 264; see also *Miller*, 38 Ill. App. 3d at 898 (Chicago police officer held to have violated residency rule requiring him to reside in Chicago; although his declared intent was to reside in Chicago, his acts and interests in Villa Park manifested that his permanent residence was indeed that outside suburb).

■ In the instant case, although the Anghels' declared intent for the time period at issue may have been to reside in Chicago Heights within the district, their acts and interests, as we have already discussed, clearly manifested a contrary intent: to live in the University Park home as their primary and permanent residence. It is our view that any "residence" the Anghels may have intended to create within the district by purchasing the Chicago Heights home was done so solely to enjoy the benefits of free schooling; this, in and of itself, does not establish residency for school purposes. See *Turner*, 54 Ill. 2d at 72; *Logsdon*, 311 Ill. at 427; *Ashley*, 275 Ill. at 279; *Connelly*, 112 Ill. App. 3d at 261; *Saxe*, 206 Ill. App. at 383. Accordingly, because the University Park home—the Anghels' true permanent residence— was outside the boundaries of the district, Andra did not qualify as a resident student at the start of the 2002-03 school year and could not attend the high school on a tuition-free basis at that time.

## II. Cross-Appeal for Sanctions

■ Our remaining consideration in this cause is Mihaela's cross-appeal for Rule 137 sanctions against the Board. The trial court denied her request. On appeal, Mihaela asserts that this was erroneous because the Board purposefully charged her for tuition for the 2001-02 school year when it knew it could not do so and because the Board removed Andra from school, thereby constituting "vexatious or harassing action without legal foundation" meriting these sanctions. In reviewing all of the arguments presented by both parties with respect to this issue, we disagree with Mihaela.

The decision whether to grant Rule 137 sanctions lies with the sound discretion of the trial court and we may not disturb its decision unless there is an abuse of that discretion. See *Dowd & Dowd, Ltd. v. Gleason,* 181 Ill. 2d 460, 487 (1998). Thus, we afford the trial court considerable deference in this decision. See *Technology Innovation Center, Inc. v. Advanced Multiuser Technologies Corp.,* 315 Ill. App. 3d 238, 244 (2000). The party requesting the imposition of Rule 137 sanctions bears the burden of proof and must show that the opposing party made untrue and false allegations without reasonable cause for the mere purpose of invoking harassment or undue delay of the proceedings. See *Technology Innovation,* 315 Ill. App. 3d at 243-44. Because of Rule 137's penal nature, it must be strictly construed and the proposing party must prove each element of the alleged violation with specificity. See *Dowd,* 181 Ill. 2d at 487; *Technology Innovations,* 315 Ill. App. 3d at 244.

Based on our review of the record here, we do not find any abuse in the trial court's determination that the Board's actions in this cause did not merit the imposition of Rule 137 sanctions. The Board conceded to Mihaela's observations that, under the School Code, tuition cannot be charged of a nonresident student if that student initially began the school year as a resident. In light of the difficulty the Board experienced in first determining the time frame of Andra's nonresidency (*i.e.,* the Anghels never changed the residence listed on Andra's 2001-02 and 2002-03 school registration forms and allowed it to remain the Flossmoor apartment until almost the time of the hearing even though they had terminated their lease as early as September 2001), we do not find any vexatiousness. Moreover, the Board immediately modified its petition for tuition accordingly, conducting a new accounting. Regarding Andra's removal, we note that the Anghels were notified of this before the Board prohibited Andra on January 23, 2003, from reenrolling in the spring 2003 school term. Furthermore, the Board immediately and voluntarily enjoined itself from barring Andra from classes and allowed her to return on January 27,

2003, just five days later pending an outcome on the merits of this cause, without receiving any tuition payment from the Anghels. We fail to see how this conduct, or any other conduct on the part of the Board as exhibited in the record on appeal, would rise to the level of the sanctions Mihaela seeks.

## CONCLUSION

For the foregoing reasons, we reverse that part of the trial court's judgment dealing with residency, thereby reinstating the administrative decision finding that the Anghels owed the Board $5,901.15 in tuition due to Andra's nonresident status from the start of the 2002-03 school year until January 2003, and affirm that part of the trial court's judgment denying Mihaela's request for Rule 137 sanctions against the Board.

Reversed in part; affirmed in part.

O'MARA FROSSARD, P.J., and GALLAGHER, J., concur.