**2021 IL 127052**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket Nos. 127052, 127053)

MATTHEW CORBIN, Appellant, v. MARY SCHROEDER *et al.*, Appellees.

*Opinion filed April 27, 2021.*

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman and Overstreet concurred in the judgment and opinion.

Justice Carter dissented, with opinion, joined by Justice Michael J. Burke.

Justice Neville took no part in the decision.

**OPINION**

¶ 1    The sole issue in this case is whether the Glendale Heights Municipal Officers Electoral Board (Electoral Board) incorrectly overruled an objection by Matthew Corbin to nominating petitions for Village of Glendale Heights president filed by

Linda Jackson and Edward Pope. Corbin asserted that the petitions from both Jackson and Pope failed to include a sufficient number of signatures to support their candidacies as required by section 10-3 of the Election Code. 10 ILCS 5/10-3 (West 2018). The Electoral Board found that Jackson and Pope justifiably relied on Village Clerk Marie Schmidt's statements regarding the number of required signatures and thus excused their violations of section 10-3. The trial court affirmed the Electoral Board's decision, and the appellate court affirmed the trial court's decision.

¶ 2    On April 2, 2021, we issued an order reversing the appellate court's judgment with an opinion to be filed in due course. Here is that opinion.

¶ 3                                          BACKGROUND

¶ 4    Under section 3.1-25-20 of the Illinois Municipal Code, a village "shall nominate and elect candidates for president and trustees in nonpartisan primary and general elections," unless the village's voters choose by referendum to require partisan primary and general elections. 65 ILCS 5/3.1-25-20 (West 2018). That section also provides that "[v]illages that have nominated and elected candidates for president and trustees in partisan elections prior to January 1, 1992, may continue to hold partisan elections without conducting a referendum." *Id.* Under section 7-1(d) of the Election Code, a village that has held partisan elections "may adopt a system of nonpartisan primary and general elections for the election of village officers," if the village's voters choose by referendum to do so. 10 ILCS 5/7-1(d) (West 2018). Incorporated in 1959, the Village of Glendale Heights has held partisan elections. It still does. The Village has never held a referendum on switching to nonpartisan elections.

¶ 5    The Village, however, does not hold primary elections. It only holds general elections because candidates traditionally have run as independents. The fact that the candidates are independents and not affiliated with political parties does not make the Village's elections nonpartisan under state law. It simply affects the dates on which candidates must file their nominating papers with the village clerk, as well as the number of required signatures. Section 10-3 of the Election Code, which applies to partisan elections like those held in Glendale Heights, states:

"Nominations of independent candidates for public office within any district or political subdivision less than the State, may be made by nomination papers signed in the aggregate for each candidate by qualified voters of such district, or political subdivision, equaling not less than 5%, nor more than 8% (or 50 more than the minimum, whichever is greater) of the number of persons, who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area." *Id.* § 10-3.

By contrast, section 3.1-25-30 of the Municipal Code, which applies to nonpartisan elections, states, "The petition in the nomination papers shall contain a number of signatures of electors residing within the same village as the candidate equal to at least 1% of the total vote cast at the last preceding election in the village for president." 65 ILCS 5/3.1-25-30 (West 2018).

¶ 6        Marie Schmidt has been the Glendale Heights village clerk since 2008. In that capacity, she has served as the Village's election official for more than a dozen years. Before municipal consolidated elections, Schmidt typically prepares "packets" for candidates containing instructions and forms. One of those forms is an "INDEPENDENT CANDIDATE PETITION," where candidates compile the voter signatures required by section 10-3. On September 9, 2020, Schmidt received an e-mail from David Lindstrom, the Du Page County Clerk's election manager, with the subject "Consolidated Election—Candidate Packets—Partisan." Lindstrom sent a zip file to election officials like Schmidt that included a "Welcome Letter." That letter instructed local election officials to view the attached candidate packets and added, "Due to Covid-19 and touch point restrictions, the Election Division is not mailing packets to districts for distribution." The zip file also included a document titled "2021 MUNICIPAL ELECTION SUPPLIES" and subtitled "Partisan." That document listed seven forms for independent candidates, one of which was an "Independent Candidate Petition." Lindstrom's e-mail did not mention any changes either to the Election Code generally or specifically to section 10-3's signature requirement.

¶ 7        In mid-December 2020, Jackson filed a statement as an independent candidate for village president. She also filed a five-page "INDEPENDENT CANDIDATE PETITION" containing a total of 50 signatures from the Village's voters. On

December 21, 2020, Pope filed a statement as an independent candidate for village president. He also filed a four-page "INDEPENDENT CANDIDATE PETITION" containing a total of 32 signatures from the Village's voters.

¶ 8   On December 30, 2020, Corbin filed objections to the petition from both candidates. Corbin alleged, *inter alia*, that the number of signatures for Jackson and Pope was insufficient under section 10-3. According to Corbin, there were 2354 ballots cast for Glendale Heights village president at the 2017 election.[1] Thus, candidates had to submit between 118 and 188 signatures. Jackson and Pope fell far short of that range, so Corbin insisted that their names should not be printed on the April 6, 2021, consolidated general election ballot.

¶ 9   On January 23, 2021, the Electoral Board held a hearing. Schmidt testified that the Du Page County Election Commission advised her before previous elections, but that entity no longer exists. For the 2021 election, she received information from the election division of the Du Page County Clerk's Office. Schmidt testified that a staff member from that office sent an e-mail to her, which she characterized as saying "due to COVID, we are reducing the points of contact, here is a list of forms."

¶ 10   Schmidt stated that she read the State Board of Elections 2021 Candidate's Guide, and "it said that you needed one percent of the mayoral totals from the last mayoral election, which would have been 2017." See Ill. State Bd. of Elections, 2021 Candidate's Guide (July 2020), https://www.elections.il.gov/DocDisplay. aspx?Doc=/Downloads/ElectionOperations/PDF/2021CanGuide.pdf&MID=367 [https://perma.cc/YE64-LEHR] (hereinafter Candidate's Guide). According to Schmidt, that percentage was "for non-partisan." Although Schmidt "questioned that," she admitted that "[t]here was really no discussion about it." She clarified that she did discuss the percentage while "chatting about something" with the village board. The board members trusted her, so they did not doubt her when she told them "this is what I got from the Election Commission." Schmidt did not "agree with the number being so low" because it would "bring out" a lot of candidates. She recalled saying, "I can't believe they are being that stupid and only asking for one percent." Schmidt, who was running for reelection herself, calculated that, because there were 2354 voters in the 2017 election, the number of

---

[1]Jackson defeated Pope in that election, as well as the 2013 election.

required signatures was 24. That number was less than other years "because of COVID." She relayed that information to Jackson, but she did not post it on the Village's website or include it in the candidate packets.

¶ 11    Schmidt did post fliers on the village hall's doors and bulletin boards announcing dates when nominating petitions would be accepted. When asked by Corbin's attorney whether she was aware of earlier filing periods, Schmidt said no. Those periods were "for the primaries" and "for different party elections." The Village, however, had "always been non-partisan" to Schmidt. She admitted that she did not understand the distinction between independent and nonpartisan. She mentioned Lindstrom's e-mail "that said partisan elections, *** but it was like we're non-partisan." In Schmidt's view, "The opposite of partisan is we are not partisan."

¶ 12    According to Schmidt, 2020 was a different year, and she misinterpreted what she read in the handbook. That misinterpretation was colored by the COVID-19 pandemic and the difficulty of obtaining signatures. In Schmidt's mind, the low percentage was "because a lot of people were not answering their doors because of COVID." Schmidt stated, "I honestly thought it was because of COVID and reducing the point of contact. Everything has changed in the past year. Nothing is the same. And it made sense that you would require fewer signatures and have fewer points of contact." She acknowledged that neither the Governor, the State Board of Elections, the Du Page County Election Commission, nor anyone else ever informed her that the statutorily required number of signatures had been reduced because of the pandemic.

¶ 13    Jackson testified that she had been village president for 20 years; she was first elected in 2001 and reelected in 2005, 2009, 2013, and 2017. In the lead-up to the 2021 election, Jackson obtained "petition packages" from Schmidt and "simply asked how many signatures we needed, as I have done in all five previous elections." According to Jackson,

"I asked [Schmidt] how many. She said 24. And I said you have to be kidding me. That is way, way down from what we normally have to do. And she said yes. She says, but with COVID and trying to cut back on our personal contact with other people, it made sense to me. And that means that everything in our lives has changed because of COVID. And we deal with those changes every

day. And it just made sense that they would try and keep personal contact down."

Jackson reiterated her belief that the pandemic was the reason for the low percentage:

"I felt that because of COVID, because it has affected every single thing in our lives, we have had to cut down on the amount of people that can even be in a room together. So for them to have reduced the number of signatures needed, it made sense to me because it would cut down on physical contact with other people."

¶ 14 Every time that Jackson saw Schmidt around that time, "we more or less said I can't believe it. But she also showed me where it said non-partisan, one percent. And I totally agreed. [Schmidt] has been a phenomenal Clerk. She's always provided us with information." Jackson saw the "paperwork" to which Schmidt referred and "had no reason to doubt that that was not correct."[2] Jackson did not see any other document indicating the percentage was higher, and no one ever told her that they thought that that percentage was inaccurate. Though the percentage was five in her prior elections, Jackson never calculated the number of signatures herself. She relied on Schmidt's representation as to the number of signatures required and never consulted with an election law attorney.

¶ 15 Like Schmidt, Jackson believed that Glendale Heights held nonpartisan elections and that she was a nonpartisan candidate: "Partisan was you represented a political party. I have never *** declared whether I was democrat, republican, libertarian, anything. So I actually thought it was non-partisan." She was unaware that her petition pages used the word independent "until after all of this happened" following Corbin's objection.

¶ 16 Pope testified that he was "a little vague on the number" of signatures required when he brought his petitions to the village hall. He spoke with Tracy Walters, the executive secretary to the village administrator about that number. Pope stated:

---

[2]Jackson stated that she did not read the Candidate's Guide where Schmidt found the 1% figure, so it is unclear what paperwork Schmidt shared with Jackson.

"I had tried calling [Schmidt], but she had been out. And we got there, I said I wanted to verify the number of signatures we needed because it did seem unusually low. But with COVID and everything, I didn't know if the rules had changed. And I had done the math several times myself and kept coming up with a different number so I wanted to see.

We had far more signatures than we needed, but again, I think [Jackson] had addressed earlier [in the hearing] that there's usually the five percent minimum, eight percent maximum, so I asked Tracy if she could verify that for me. She said that she did not know, but she would go in and contact Marie.

*** I waited in the lobby and she came back and told us it was one percent. It was 24. We needed 24 signatures was the minimum. She had said that there was no maximum.

I was still concerned about the maximum, though, because of years past that there was one, so I submitted what I had in my hands and I held back another 50 signatures.

\* \* \*

She told us it was 24 so we wanted to have a little bit of a cushion in there, so I think I ended up submitting around 35. I figured that wasn't too far over because I was afraid there was a penalty if you submitted too much over, so I held back the rest."

Pope later shredded the signatures that he did not submit.

¶ 17    Pope trusted Walters, "one of the most stand-up people at the Village," and Schmidt. According to Pope, "there's so many different numbers out there. When you look at the Election Board and all the different elections, it was kind of hard to figure out. That's why we wanted the Village to verify it so that we weren't turning in too few or too many." He explained his thinking:

"You know, I just assumed the number was substantially lower possibly because of COVID. You know, trying to have the low contact and it was very difficult this year talking to people and people were even afraid to touch our

pens when we were going door-to-door. So that was kind of my assumption, that it had something to do with COVID.

I just wanted to clarify that *** when we got to the Village Hall, that's why we asked Miss Walters the question. And she was kind enough to go talk to Mrs. Schmidt who clarified it for us, and then we submitted everything and, you know, the rest of the story, that that's where we thought it ended.

*** I had a lot more signatures, but since we didn't think we needed them and we didn't know about all this coming up, like I said, we shredded them and just thought that we were moving on with the election phase, so that's where we left it."

Pope did not consult with an election law attorney, and he did not obtain a copy of the Candidate's Guide. He understood that he was an independent candidate and that his statement of candidacy and petition pages used the word independent: "I don't believe we run in Glendale Heights under a label, so I thought independent was correct."

¶ 18    Michael Marron testified that he is the Glendale Heights village administrator. He recalled a conversation with Schmidt in late August or early September 2020. Marron was at the village hall for the day, and Schmidt was at her desk, "and she said wow, you know what they did with the signatures? And I said no. And she said well, we only need like 24 signatures now. And I said oh, okay. *** And it had to do with COVID was what she told me."

¶ 19    Marron also recalled a conversation with Jackson in late December 2020 after Corbin's objections were filed. According to Marron, Jackson believed that she had a sufficient number of signatures "based on her conversations with the Clerk." Marron looked at papers filed by two other candidates for village president, who submitted "well over 100 signatures, that might have been over 200." Jackson and Pope "did not have that many signatures." Jackson indicated to Marron that "she believed that because of COVID, that the numbers were lower than they normally were. There was discussion that there had been different changes in how the general elections had been handled, and there appeared to be confusion as to the correct number of signatures that were needed."

¶ 20 Marron later spoke with Jackson's election law attorney, Tiffany Nelson-Jaworski, and discussed "the differentiation between partisan and non-partisan and how a person would determine whether an election was partisan or non-partisan." Marron and Nelson-Jaworski

"both came to the conclusion that it was difficult to determine that. There is nothing in our Village Ordinances that dictate whether it's a partisan or non-partisan election. She did tell me that it was. I learned that it was a partisan election and that Candidates run as independents. But again, that was well after the fact of the objections being filed."

¶ 21 The Electoral Board took "judicial notice" of the Governor's executive orders and proclamations related to the pandemic, as well as various documents regarding the Village and the county responses to it. On February 4, 2021, the Board issued a written decision overruling Corbin's objections. The Board observed that this case "involves the competing interests of an objector's right to see that the Election Code is enforced and a candidate's right to ballot access, a substantial right which shall not be lightly denied." Corbin relied upon this court's opinion in *Jackson-Hicks v. East St. Louis Board of Election Commissioners*, 2015 IL 118929, which held that the signature requirement in section 10-3 is mandatory. Jackson relied upon *Merz v. Volberding*, 94 Ill. App. 3d 1111 (1981), and *Atkinson v. Schelling*, 2013 IL App (2d) 130140, which held that candidates could rely upon local election officials' determinations as to the signature requirement.

¶ 22 The Board noted that the question of reliance was a factual one. In that regard, the Board made several unanimous findings of fact: The witnesses were credible, Schmidt advised Jackson and Pope that the number of required signatures was 24, Schmidt was acting in her official capacity when she made those statements, and Jackson and Pope relied upon those statements. The Board also opined that "[d]enying [the candidates] access to the electoral ballot for the April 6, 2021 Consolidated Election would penalize not only them but the voters of the Village."

¶ 23 Two board members made the additional findings that the reliance by Jackson and Pope was justified. One board member disagreed, based on *Jackson-Hicks*. The Board (or at least of a majority of it) then concluded that *Jackson-Hicks* was distinguishable because the candidate there did not argue reliance or estoppel. The Board's majority continued:

"The Electoral Board does not read *Jackson-Hicks* or *Merz* to forever preclude a candidate or candidates from asserting or raising a reliance or estoppel argument when a certain set of facts and circumstances arises. Given the extraordinary circumstances presented by the COVID-19 pandemic, difficulty in maintaining social distancing when gathering voters' signatures on petition sheets, limited access to and communication with the Du Page County Clerk, the Local Election Authority, this Electoral Board finds that given the undisputed and unrefuted facts and evidence presented at the evidentiary hearing [the candidates] have successfully raised and established the defense of justifiable reliance on the signature requirement being 24 for the Office of Village President as communicated to them by the Village Clerk. The Electoral Board also notes that reliance can be found even absent a pandemic and despite written warnings to candidates 'to be knowledgeable of all election requirements' and that they should seek legal counsel.' "

¶ 24    Corbin sought judicial review. On February 19, 2021, the trial court denied the petition and affirmed the Board's decision. Corbin appealed.

¶ 25    In separate unpublished and largely identical orders, the appellate court affirmed the trial court's decision. 2021 IL App (2d) 210085-U; 2021 IL App (2d) 210086-U. The appellate court initially dispensed with Corbin's argument that the Electoral Board and the trial court did not determine the minimum signatures required under section 10-3 of the Election Code. Corbin contended that, pursuant to *Ramirez v. Chicago Board of Election Commissioners*, 2020 IL App (1st) 200240, the relevant "next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area" (10 ILCS 5/10-3 (West 2018)) was the November 2018 general election and not the 2017 consolidated general election. 2021 IL App (2d) 210085-U, ¶ 20; 2021 IL App (2d) 210086-U, ¶ 20. The appellate court agreed with the trial court that reaching that issue would be "purely advisory." 2021 IL App (2d) 210085-U, ¶ 21; 2021 IL App (2d) 210086-U, ¶ 21.[3] Because "[t]he candidates did not come close to the statutory threshold minimums, regardless of whether the 2017 or 2018 election figures are used," the

---

[3]The appellate court did reach that issue in another case, concluding that the 2017 election was the proper one under the statute. See *Corbin v. Schroeder*, 2021 IL App (2d) 210090-U, ¶¶ 16-17.

sole question was whether the Board properly found that the candidates' reliance on Schmidt's statements about the number of required signatures was reasonable. 2021 IL App (2d) 210085-U, ¶ 21; 2021 IL App (2d) 210086-U, ¶ 21.

¶ 26    The appellate court observed that this court in *Jackson-Hicks* "expressed, at best, skepticism over the *Merz* and *Atkinson* analyses." 2021 IL App (2d) 210085-U, ¶ 26; 2021 IL App (2d) 210086-U, ¶ 26. The appellate court stated estoppel was not an issue in *Jackson-Hicks*, so this court's criticism was merely a word of caution that, "with respect to section 10-3's mandatory-signature requirements, estoppel will rarely, if ever, be appropriate." 2021 IL App (2d) 210085-U, ¶ 27; 2021 IL App (2d) 210086-U, ¶ 27. "Moreover, *** when the *Jackson-Hicks* candidate circulated petitions, there was no global pandemic impacting all aspects of life." 2021 IL App (2d) 210085-U, ¶ 27; 2021 IL App (2d) 210086-U, ¶ 27.

¶ 27    The appellate court expanded on that theme, agreeing with the Board that "the COVID-19 pandemic is an exceptional circumstance," as evidenced by the Governor's executive orders that "affected procedures in virtually all aspects of life." 2021 IL App (2d) 210085-U, ¶ 28; 2021 IL App (2d) 210086-U, ¶ 28. The appellate court conceded that "there was no change" to section 10-3 and that "Schmidt mistakenly consulted the requirements for a different type of candidacy." 2021 IL App (2d) 210085-U, ¶ 28; 2021 IL App (2d) 210086-U, ¶ 28. The critical inquiry was not why Schmidt made a mistake but why the candidates relied on it and whether that reliance was, under the extraordinary circumstances, reasonable. 2021 IL App (2d) 210085-U, ¶ 28; 2021 IL App (2d) 210086-U, ¶ 28. The court concluded that the Board's finding that the candidates' reliance was reasonable was not against manifest weight of the evidence. 2021 IL App (2d) 210085-U, ¶ 28; 2021 IL App (2d) 210086-U, ¶ 28.

¶ 28    The appellate court refused to accept Corbin's suggestion that there is no room to consider the world's circumstances when assessing a reliance claim. 2021 IL App (2d) 210085-U, ¶ 33; 2021 IL App (2d) 210086-U, ¶ 33. Like the *Merz* court, the appellate court in this case limited its holding to the unusual facts. 2021 IL App (2d) 210085-U, ¶ 33; 2021 IL App (2d) 210086-U, ¶ 33. The court closed by stressing that

> "the COVID-19 pandemic presented exceptional circumstances that informed the reasonableness of the reliance claim here. We strongly emphasize that our

decision should not be read broadly or be construed as minimizing the importance of strict compliance with statutory requirements. Rather, we acknowledge that the pandemic's extreme alterations of procedures and norms influenced this case and, as the pandemic is, hopefully, a once-in-a-lifetime event, similar circumstances are unlikely to arise again." (Emphasis omitted.) 2021 IL App (2d) 210085-U, ¶ 33; 2021 IL App (2d) 210086-U, ¶ 33.

¶ 29    Corbin filed two petitions for leave to appeal (see Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2020)), as well as two motions to expedite our consideration of them. We granted the motions and consolidated the cases. We ordered that the case be submitted on memoranda filed by the parties.[4]

¶ 30                                ANALYSIS

¶ 31    An objector whose challenge to a municipal candidate's nominating petitions is rejected by an electoral board may seek judicial review of that decision under section 10-10.1 of the Election Code. 10 ILCS 5/10-10.1 (West 2018)). Because an electoral board is an administrative agency, that review is more accurately administrative review. *Jones v. Municipal Officers Electoral Board*, 2021 IL 126974, ¶ 12. Thus, a subsequent appeal of the trial court's decision still involves the propriety of the underlying electoral board decision. See *Burns v. Municipal Officers Electoral Board of the Village of Elk Grove Village*, 2020 IL 125714, ¶ 10; accord *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 212 (2008) ("where a circuit court reviews an electoral board's decision pursuant to section 10-10.1 of the Election Code, we review the decision of the board, not the court").

¶ 32    Our standard of review of the Electoral Board's decision depends on the question presented. *Id.* at 209-10. Where the appeal presents a question of fact, we will not overturn the Electoral Board's decision unless it is against the manifest weight of the evidence. *Id.* at 210. Where the appeal presents a question of law, we proceed *de novo*. *Id.* And where the appeal concerns the Electoral Board's

---

[4]Corbin filed a memorandum, and Jackson and the Electoral Board each filed a response memorandum. Pope did not file a memorandum.

determination on a mixed question of law and fact, that decision will not be disturbed unless it is clearly erroneous. *Id.* at 211.

¶ 33 Corbin did not frame the issue in his petitions for leave to appeal or his memorandum. In his memorandum, however, he insists that *de novo* review is appropriate because the facts are admitted or established and the parties' disagreement centers on whether the Electoral Board correctly interpreted and applied the governing legal provisions. We agree. "Where, as here, historical facts are admitted or established and the only dispute concerns whether the governing legal provisions were interpreted correctly by election officials, the case presents a purely legal question for which our review is *de novo*." *Jackson-Hicks*, 2015 IL 118929, ¶ 20. The issue in this case is purely legal—namely, whether the percentages in section 10-3 may be diluted by statements from a municipal election official, so that candidates may obtain ballot access with fewer than the statutorily mandated number of signatures.

¶ 34 Before reaching the merits of that issue, we must comment upon Corbin's initial argument regarding "the next preceding regular election" under section 10-3. Relying upon *Ramirez*, Corbin asserts that "the next preceding regular election" was not the April 2017 consolidated election but the November 2018 general election. In the Village of Glendale Heights, there were 2354 votes in the former election and 8403 votes in the latter election. Applying the statutory 5-8% factor to those votes yields different requirements. If the April 2017 election matters, the requirement was 118 to 188 signatures. If the November 2018 election matters, the requirement was 491 to 784 signatures.

¶ 35 Like the lower courts, we decline to decide this point. As Corbin acknowledges in his memorandum, Jackson and Pope were well short of the minimum number of required signatures whether that number is based on the April 2017 election or the November 2018 election. Jackson filed 50 signatures; Pope filed 32. The question becomes whether their shortfalls were excusable due to their reliance on Schmidt's statements that only 24 signatures were required. The Electoral Board thought so, concluding that their reliance was justified. The Electoral Board deemed *Jackson-Hicks* "inapplicable." We deem it controlling.

¶ 36 *Jackson-Hicks*, 2015 IL 118929, ¶ 37, unambiguously clarified that, with respect to section 10-3's signature requirement, close enough is not good enough.

There, East St. Louis election authorities correctly calculated that 136 signatures were required for mayoral candidates in the 2015 consolidated election. *Id.* ¶ 4. The incumbent mayor filed nominating petitions with 171 signatures. *Id.* ¶ 5. An objector challenged some of those signatures, and an election board attorney agreed that at least 48 of them were invalid, leaving the mayor with only 123 signatures. *Id.* ¶ 6. The electoral board still rejected the objector's challenge, finding that there was substantial compliance with the Election Code's signature requirement. *Id.* ¶ 7. The trial court and the appellate court both affirmed that ruling. *Id.* ¶¶ 8-9.

¶ 37        This court reversed. *Id.* ¶ 45. We observed that Election Code requirements, including the numerical signature requirements, are generally considered mandatory. *Id.* ¶¶ 23-24. Section 10-3 specifically "does not say, and cannot be fairly read to mean, that the minimum number of signatures needed to support such nomination papers is anything but fixed and definite." *Id.* ¶ 30. We explained:

> "Implicit in the law's provision that nominations may be made through nomination papers containing 'not less than' the required minimum numbers of signatures is that nominations may *not* be made through nomination papers containing a number of signatures which *is* less than the minimum required by law. The latter proposition is a corollary of the former." (Emphases in original.) *Id.* ¶ 31.

¶ 38        Though ballot access is a substantial right, that right is circumscribed by the legislature's authority to regulate elections. *Id.* ¶ 32. And it has exercised that authority in section 10-3, opting for "a mathematical formula which is precise and definite in its meaning, clear and certain in its application, and by its nature, excludes any possibility of impermissible political bias." *Id.* ¶ 35. By contrast, a substantial compliance approach is "subjective, uncertain and changeable on a case-by-case basis." *Id.* We held that the former standard is the one that the electoral board was bound to follow and the one that this court is required to enforce. *Id.*

¶ 39        We then dealt with *Merz* and *Atkinson*, which we found unpersuasive. *Id.* ¶ 39. First, "substantial compliance is not a valid justification for deviating from the clear and unambiguous minimum signature threshold set by the legislature." *Id.* Second, even if estoppel was properly invoked against election authorities in those cases, the mayoral candidate did not raise that issue. *Id.* We cited with approval *Vestrup v. Du Page County Election Comm'n*, 335 Ill. App. 3d 156, 166 (2002), which

- 14 -

expressly declined to follow *Merz* because it "failed altogether to acknowledge the specific rules regarding estoppel against the State." See *Jackson-Hicks*, 2015 IL 118929, ¶ 39. And we observed that even *Merz* stated that the minimum statutory signature requirement is mandatory and should be strictly followed. *Id.* "We do not see how the law could be otherwise." *Id.* ¶ 40. If a substantial-compliance approach were accepted,

> "there would be no way to insure consistency from one electoral jurisdiction to another, from one election to another, or even from one race to another. Local election officials could establish how many signatures are sufficient on a case-by-case basis according to a standard that is not only subjective and variable, but which lacks any obvious limits. Will 90% of the statutory minimum turn out to be enough? 75%? Less than that? Candidates will be left to speculate, and significant delay and uncertainty will inevitably result as objectors seek redress from the courts to review whether the signature cutoff was fairly and properly set by local election officials in particular cases." *Id.*

¶ 40    Ultimately, we left the holdings of *Merz* and *Atkinson* intact, but the rationale for those holdings is troublingly thin. Neither case precisely describes or methodically applies the reliance/estoppel approach. *Merz* loosely referred to "the doctrine of estoppel" and the candidates' "defense of reliance" but did not articulate the parameters of that doctrine or the target of that defense. *Merz*, 94 Ill. App. 3d at 1115. The *Merz* court allowed a candidate to "invoke" the doctrine because it would be "a great injustice" to penalize a candidate for misunderstanding a provision of the Election Code and then accepting the validity of information traditionally distributed by a local election official. *Id.* at 1117. *Atkinson* merely stated that "to invoke estoppel against a public body a litigant must establish an affirmative act on the part of the public body that induced substantial reliance." *Atkinson*, 2013 IL App (2d) 130140, ¶ 12 (citing *Heabler v. Municipal Officers Electoral Board*, 338 Ill. App. 3d 1059, 1063 (2003)). The *Atkinson* court tracked *Merz* and concluded that the candidates "actually relied" on information from a local election official, so they may "invoke the doctrine of estoppel." *Id.* ¶ 15. The appellate court in this case was no more disciplined in its analysis, referring to the candidates' "estoppel defense" (2021 IL App (2d) 210085-U, ¶ 22; 2021 IL App (2d) 210086-U, ¶ 22) and their "reliance claim" (2021 IL App (2d) 210085-U, ¶ 33; 2021 IL App (2d) 210086-U, ¶ 33). The appellate court never outlined the elements of such a defense

or claim or explained how they might be established but merely accepted that they were.

¶ 41    Unsurprisingly, the memoranda from Jackson and the Election Board in this case suffer from the same infirmities. In pressing reliance-estoppel arguments in their memoranda, Jackson and the Electoral Board ignore our oft-repeated comment that estoppel against municipalities is disfavored. See *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 40. Consequently,

> "a plaintiff seeking to invoke equitable estoppel against a municipality must plead specific facts that show (1) an affirmative act by either the municipality itself or an official with express authority to bind the municipality; and (2) reasonable reliance upon that act by the plaintiff that induces the plaintiff to detrimentally change its position." *Id.*

Jackson and the Electoral Board cover those factors, but there is still a missing part of the equation.

¶ 42    "Regarding equitable estoppel, we have stated that where a person has said or done something, and another party has reasonably and detrimentally relied upon that statement or conduct, the person cannot deny it." *Id.* ¶ 35. Jackson never identifies the "person" to be estopped or the "something" that that person said or did and now cannot deny. In her memorandum, Jackson makes a passing reference to Corbin's assertion that "estoppel should not apply against the Village Clerk." Is Jackson suggesting that Schmidt is the person to be estopped because she casually shared misinformation with a handful of candidates? And what is she to be estopped from doing? Schmidt never attempted to enforce the statute, so is Jackson suggesting that Schmidt should be estopped from even admitting her mistake? If so, Jackson never asked for Schmidt's equivocal testimony in that regard to be stricken.

¶ 43    Additionally, Jackson cites one case for the rule on what a litigant must establish to invoke estoppel against a public body. What is that public body? Is it the Village? Or is it the Village's Electoral Board? Is Jackson suggesting that either the Village or the Electoral Board should be estopped from enforcing section 10-3? Jackson does not explain how principles of equitable estoppel against a municipality defeat the application of a mandatory statute. See *Jackson-Hicks*, 2015

IL 118929, ¶ 24 ("Statutory provisions such as those contained in our Election Code specifying numerical signature requirements are among those that are regarded as mandatory.")). Stated differently, Jackson aims not to invoke equitable estoppel so much as suspend an Election Code provision because it seems like the right thing to do and "because of COVID."

¶ 44 That phrase peppers the testimony of Schmidt, Jackson, and Pope in the Election Board hearing. The pandemic also loomed large in the mind of the appellate court, who commented at length about the "exceedingly rare" and "exceptional" circumstances that purportedly informed the candidates' thoughts and actions. 2021 IL App (2d) 210085-U, ¶ 28; 2021 IL App (2d) 210086-U, ¶ 28. The pandemic did create exceptions to many norms of daily life; it did not, however, create an exception to section 10-3. See *Jackson-Hicks*, 2015 IL 118929, ¶ 29 ("When statutory language is plain and unambiguous, the statute must be applied as written without resort to aids of statutory construction [citation], and the court will not read into it exceptions, conditions, or limitations that the legislature did not express [citation]."). Further, the appellate court referred to the robust executive response to the pandemic and "changes" to various procedures ordered by the Governor. 2021 IL App (2d) 210085-U, ¶ 28; 2021 IL App (2d) 210086-U, ¶ 28. None of those changes concerned section 10-3 of the Election Code, which remained untouched by COVID-19.

¶ 45 Everything that we said in *Jackson-Hicks* about the substantial-compliance approach to section 10-3's signature requirement applies with equal force to the reliance/estoppel approach to that same requirement employed in *Merz* and *Atkinson* and adopted by the Electoral Board in this case. Both approaches are fatally flawed because they replace the mandatory, objective direction of the legislature with something more discretionary and subjective. The appellate court in those cases mentioned that the candidates had shown initiative and demonstrated a minimal appeal to voters, intimating that those qualities might substitute for strict compliance with Election Code signature requirements. *Merz*, 94 Ill. App. 3d at 1118; *Atkinson*, 2013 IL App (2d) 130140, ¶ 21. "While the signature requirement may have been aimed at showing candidate initiative and minimum voter appeal, showing candidate initiative and minimum voter appeal is not, itself, the standard." *Jackson-Hicks*, 2015 IL 118929, ¶ 37. The standard is set by section 10-3. To the extent that *Merz* and *Atkinson* hold otherwise, they are overruled. Like the

candidate in *Jackson-Hicks*, the candidates in this case "failed to meet a threshold requirement completely." *Id.* ¶ 37. And like the electoral board's decision in that case, the Electoral Board's decision in this case must be reversed.

¶ 46 In her memorandum, Jackson calls Corbin's objection "an attempt by a political rival to deny the voters of the Village of Glendale Heights the opportunity to re-elect their five-term incumbent Mayor." We see the objection in less charged terms. Though we remain cognizant that ballot access is a substantial right, we believe the best safeguard of that right is fidelity to the Election Code and not unrestrained discretion by a local election official inexplicably confused about the statutory distinction between partisan and nonpartisan elections.

¶ 47                                        CONCLUSION

¶ 48 For the reasons that we have stated, the judgment of the appellate court, which affirmed the Electoral Board's ruling, is reversed.

¶ 49 Appellate court judgment reversed.

¶ 50 Board decision reversed.

¶ 51 JUSTICE CARTER, dissenting:

¶ 52 In this consolidated election case, the primary issue is whether the Glendale Heights Municipal Officers Electoral Board erred when it applied estoppel to overrule objections to two candidates' nominating petitions that alleged the candidates failed to obtain the minimum number of signatures required by section 10-3 of the Election Code (10 ILCS 5/10-3 (West 2018)). In relevant part, the Electoral Board followed the appellate court's decisions in *Atkinson v. Schelling*, 2013 IL App (2d) 130140, and *Merz v. Volberding*, 94 Ill. App. 3d 1111 (1981), that applied principles of estoppel in analogous factual circumstances.

¶ 53 On appeal, a majority of this court reverses the Electoral Board's decision and orders that both candidates be removed from the ballot. Broadly applying this court's decision in *Jackson-Hicks v. East St. Louis Board of Electoral*

*Commissioners*, 2015 IL 118929, the majority declines to apply estoppel. The majority also overrules *Atkinson* and *Merz* and appears to permanently foreclose application of estoppel in future election cases. *Supra* ¶ 45.

¶ 54 Respectfully, I do not agree with the majority's expansive interpretation of *Jackson-Hicks* or its resolution of the estoppel issue under the unique facts in this case. I am also concerned that the majority's decision undermines this court's recognition that "Illinois courts have long held that equitable estoppel may apply against municipalities, in extraordinary and compelling circumstances." *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 35. Effectively, the majority prohibits the application of estoppel in future election cases with no consideration of why, and when, estoppel may be appropriately applied.

¶ 55 Ultimately, I agree with the conclusions of the Electoral Board, the circuit court, and the appellate court that estoppel applies to the unprecedented circumstances presented here, and I would affirm their judgments. With respect, I dissent from the majority's order removing the candidates from the ballot.

¶ 56                                    I. BACKGROUND

¶ 57 The two candidates in this election case are Linda Jackson, the current village president of Glendale Heights, and Edward Pope. Both filed nomination papers seeking to run as candidates for the office of Glendale Heights village president in the April 6, 2021, consolidated election. Jackson submitted 50 signatures, and Pope submitted 32 signatures. Petitioner Matthew Corbin filed objections to those nomination papers with the Electoral Board. In relevant part, Corbin argued that neither candidate satisfied the statutory minimum threshold for valid signatures.

¶ 58 On January 23, 2021, the Electoral Board held a consolidated hearing on Corbin's objections to the nomination papers of Jackson and Pope. At that hearing, Corbin offered two different calculations for the minimum signature requirement under section 10-3 of the Code—either 491 signatures calculated by taking 5% of the total votes in the November 2018 general election, or 118 signatures calculated by taking 5% of the votes in the April 2017 consolidated election. Under either calculation, neither Jackson nor Pope obtained sufficient signatures.

¶ 59       Maria Schmidt testified that she had served as village clerk for Glendale Heights since 2008. One of her responsibilities as village clerk was to serve as the election authority for the Village. In regard to the nomination of candidates in Glendale Heights, Schmidt prepared candidate packages that included instructions and various other documents related to running for office. In past elections, Schmidt received information about the required forms from the Du Page County Election Commission. The commission was dissolved, however, and for the first time Schmidt received the information from an employee in the election division of the Du Page County Clerk's office.

¶ 60       On the issue of the number of signatures required for candidates, Schmidt testified that in previous elections the required number of signatures was 5% to 8% of the total votes in the mayoral race. In this election, though, Schmidt calculated the number of signatures using 1% of the total votes. When asked why she used 1% to calculate the signature requirements, Schmidt testified as follows:

> "In reading the Candidate's book, it said one percent for non-partisan. And I had received an email from someone who works for [the] election division who said due to COVID, we are reducing the points of contact, here is a list of forms. *** It was an email that had a list of forms. And it said this is what you should fill out, and it said partisan election. We are non-partisan, so I looked up non-partisan. I thought it was due to COVID."

Schmidt further testified that she "didn't agree with the number being so low" and she discussed the matter with several members of the village board. Schmidt told them she "can't believe they are being that stupid and only asking for one percent."

¶ 61       Schmidt also confirmed that she discussed the 1% threshold with Jackson after a village board meeting and told Jackson that she needed only 24 signatures. Schmidt was running for reelection as village clerk and submitted between 30 and 40 signatures on her own behalf based on the belief that she only needed 24 signatures. According to Schmidt, she never had any conversations with anyone who told her the requisite number of signatures should be higher than the 1% calculation she used. Schmidt denied that she ever believed the threshold was higher than 1%.

¶ 62    On cross-examination, Schmidt confirmed that she did not discuss the 24-signature requirement at a public board meeting or tell the board members in open session that only 24 signatures were required for candidates. Nor did Schmidt post that figure on the clerk's website or include it in candidate packets.

¶ 63    Schmidt acknowledged that at the time she did not understand the difference between the terms "non-partisan" and "independent," but she believed that the Village's elections were nonpartisan. After reading materials she received from the election commission about partisan elections, Schmidt e-mailed the commission about the issue but could not recall their response. Ultimately, Schmidt testified that "this year has been very different and this was to the best of my ability at the time. It's the only way I can put it to you. I misinterpreted it."

¶ 64    Schmidt did not contact the Du Page County Clerk election manager to ask about the minimum number of signatures required because on prior occasions she was unable to get a timely response from the office due to understaffing. Schmidt confirmed that she received an e-mail from the election manager that included information about COVID's impact on election processes and that it confirmed, at least in part, her beliefs about COVID restrictions on the election. Schmidt explained:

> "[A]t that point, there were people talking about how they were going to circulate petitions. And again, that goes to the low number in my mind because a lot of people were not answering their doors because of COVID. When I had someone going out with my petitions, it would be call you, say I'm bringing a petition. Will you meet me outside? I'll leave it on your porch. You sign it. Go back in the house and I'll get it. It was a tedious process. So this all made sense. There were people who were leaving them on their front porches which violated everything because you didn't witness anyone doing it. And it was going on in the Village."

When asked by counsel why Schmidt thought 24 was a reasonable number of signatures to require for the office of village president, Schmidt stated:

> "I honestly thought it was because of COVID and reducing the point of contact. Everything has changed in the past year. Nothing is the same. And it

made sense that you would require fewer signatures and have fewer points of contact."

Schmidt confirmed, however, that she did not receive any notice from the Governor, the State Board of Elections, the Du Page County Election Commission, or anyone else that the number of signatures required had been reduced because of COVID. Schmidt did not consult with the Village's attorney about the signature requirement.

¶ 65    Jackson testified that she was the current village president of Glendale Heights and had served in that position for 20 years. Jackson was first elected village president in 2001 and was reelected in 2005, 2009, 2013, and 2017. Jackson planned to seek reelection in the April 2021 election. Jackson stated that in every prior election she obtained her petition packages from the village clerk and asked the clerk how many signatures were needed. Jackson followed the same procedure for the April 2021 election, and testified as follows:

"I asked [Village Clerk Schmidt] how many [signatures were needed]. She said 24. And I said you have to be kidding me. That is way, way down from what we normally have to do. And she said yes. She says, but with COVID and trying to cut back on personal contact with other people, it made sense to me. And that means that everything in our lives has changed because of COVID. And we deal with those changes every day. And it just made sense that they would try and keep personal contact down."

Jackson and Schmidt talked about the lower requirement on subsequent occasions, and Schmidt also showed Jackson a form that "said non-partisan, one percent." Jackson agreed with Schmidt's calculation. Jackson described Schmidt as "a phenomenal clerk" who "always provided us with information."

¶ 66    Jackson confirmed that she relied on Schmidt's statement that only 24 signatures were needed. When asked why she thought that number was adequate, Jackson testified:

"I felt that because of COVID, because it has affected every single thing in our lives, we have had to cut down the amount of people that can even be in a

room together. So for them to have reduced the number of signatures needed, it made sense to me because it would cut down on physical contact with people."

Jackson explained that she had always relied on representations from the village clerk's office when collecting signatures in her prior elections as village president.

¶ 67    On cross-examination, Jackson testified that in prior elections she collected signatures equal to 5% of the votes cast in the applicable preceding election. When Schmidt advised Jackson on the lower signature requirements based on the 1% calculation, Jackson believed that Schmidt was acting in her official duties as village clerk. Jackson did not contact an attorney to confirm the number of signatures required and was not aware of any information about signatures on the Village's public website.

¶ 68    Tracey Walters testified that she is the executive secretary to the village administrator. Walters was sworn in as a deputy clerk on December 7, 2020, to assist with accepting nominating petitions and issuing receipts. On December 21, 2020, in the lobby of the village hall, Walters was asked by Ed Pope for the required number of signatures for office of the village president. Walters did not know the answer, so she called Schmidt. Schmidt told Walters that Pope needed to submit signatures from 1% of the voters in the previous election. Walters shared this information with Pope, and Pope then submitted his petitions. Walters confirmed that she relied on the information she obtained from Schmidt about the 1% requirement and that she did not have any reason to believe that information was inaccurate.

¶ 69    Pope testified that he was running for village president in the April 2021 election, and he corroborated Walters's testimony. Specifically, Pope confirmed that he asked Walters "to verify the number of signatures we needed because it did seem unusually low. But with COVID and everything, I didn't know if the rules had changed." Walters consulted with Schmidt on the telephone and then told Pope that he need 1%, or 24 signatures.

¶ 70    Pope confirmed that he relied on representations made by Walters in her capacity as a village employee. Pope had known Walters for about 20 years, and he described Walters "as one of the most stand-up people at the Village." Pope

testified that he "took [Walters's] word as coming directly from the Clerk and I trusted both of them." Pope explained:

> "You know, I just assumed the number was substantially lower possibly because of COVID. You know, trying to have the low contact and it was very difficult this year talking to people and people were even afraid to even touch our pens when we're going door-to-door. So that was kind of my assumption, that it had something to do with COVID."

¶ 71      On cross-examination, Pope testified that he did not consult an attorney on the issue of minimum signatures. Pope did not obtain or consult the Candidate's Guide from the State Board of Elections or the Du Page County Election Commission.

¶ 72      Michael Marron testified that he is the village administrator and that in late August 2020 or September 2020 he had a brief conversation with Clerk Schmidt about signature requirements for candidates. According to Marron, Schmidt told him that candidates "only need like 24 signatures now" and "it had to do with COVID." Marron did not investigate or verify that information.

¶ 73      At the close of the evidentiary hearing, all parties rested. Corbin and Jackson later submitted posthearing memoranda to the Electoral Board.

¶ 74      On February 4, 2021, the Electoral Board entered written decisions in both cases. The Electoral Board took judicial notice, over Corbin's objection, of various disaster proclamations issued by Governor J.B. Pritzker since March 2020 in response to COVID, Governor Pritzker's executive orders related to COVID, and the Village's proclamations and emergency orders related to COVID.

¶ 75      The Electoral Board explained that it considered the reliance of Jackson and Pope on the information provided by Schmidt regarding the minimum signature requirement. Citing *Merz* and *Atkinson*, the Electoral Board concluded that Schmidt, in her capacity as village clerk, mistakenly communicated a minimum 24-signature requirement "based on her confusion of the Village being non-partisan, the Du Page County Clerk not providing specific instructions and nomination papers as it had done in past elections and the COVID-19 pandemic." The Electoral Board also concluded that Schmidt did not engage in any nefarious conduct when communicating the inaccurate information.

¶ 76    The Electoral Board made several unanimous factual findings: (1) the witnesses at the hearing testified credibly and honestly, (2) Schmidt was acting in her official capacity as the local election official and village clerk when she advised Jackson that the minimum signature requirement was 24 signatures, (3) Schmidt was acting in her official capacity when she advised Deputy Clerk Walters of the 24-signature requirement, and Walters shared that information with Pope, (4) both Jackson and Pope relied on those official representations regarding the minimum 24-signature requirement, and (5) denying Jackson and Pope access to the ballot for the April 6, 2021, consolidated election would penalize not only them but the voters of the Village.

¶ 77    A majority of the Electoral Board then found that Jackson's and Pope's reliance on Schmidt's inaccurate information about the signature requirement was justified. One member disagreed, interpreting this court's decision in *Jackson-Hicks*, 2015 IL 118929, to require "strict compliance" with the statutory requirement on signatures.

¶ 78    Accordingly, the Electoral Board overruled Corbin's objections. The Board ordered that the names of Jackson and Pope be printed on the ballot for the office of village president of Glendale Heights at the April 6, 2021, consolidated election.

¶ 79    Corbin petitioned the circuit court for judicial review in both cases. After a hearing, the circuit court denied his petitions and affirmed the Electoral Board's decisions. On appeal, the appellate court affirmed. 2021 IL App (2d) 210085-U; 2021 IL App (2d) 210086-U. We allowed Corbin's petitions for leave to appeal (Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2020)) and consolidated the cases.

¶ 80                                    II. ANALYSIS

¶ 81    When, as here, a circuit court has reviewed an electoral board's decision, this court reviews the decision of the electoral board, not the court. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 212 (2008). Because an electoral board is considered an administrative agency, our standard of review is determined by the type of question involved in the appeal. *Id.* at 209-10.

¶ 82     An electoral board's findings and conclusions on questions of fact are deemed *prima facie* true and correct. On review of an electoral board's factual findings, the reviewing court is not allowed to reweigh the evidence or substitute its judgment for that of the electoral board. Instead, the reviewing court's role is limited to determining whether such factual findings are against the manifest weight of the evidence, which will be found only when the opposite conclusion is clearly evident. In contrast, we review *de novo* an electoral board's decision on a question of law, such as the interpretation of a statute. *Id.* at 210.

¶ 83     An electoral board's decision on a mixed question of fact and law will be reversed only if its decision is " 'clearly erroneous.' " *Id.* at 211. Mixed questions " 'are "questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." ' " *Id.* at 211 (quoting *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Electoral Board*, 216 Ill. 2d 569, 577 (2005), quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982)).

¶ 84     The majority concludes that *de novo* review applies to the Electoral Board's decision in this case but only after reframing the issue presented by the parties. According to the majority, "[t]he issue in this case is purely legal—namely, whether the percentages in section 10-3 may be diluted by statements from a municipal election official, so that candidates may obtain ballot access with fewer than the statutorily mandated number of signatures." *Supra* ¶ 33. I note, however, that no party framed the dispute in this manner.

¶ 85     Instead, as they did in the circuit court and the appellate court, the parties focus on whether the Electoral Board erred in applying estoppel to the facts of this case. That question presents a mixed question of fact and law, subject to the " 'clearly erroneous' " standard. *Cinkus*, 228 Ill. 2d at 211. To the extent that Corbin challenges the Electoral Board's factual findings, the deferential manifest weight of the evidence standard applies. *Id.* at 210.

¶ 86     Turning to the merits of the parties' arguments on estoppel, there is no question that equitable estoppel may apply against a municipality under the appropriate narrow circumstances. *Patrick Engineering*, 2012 IL 113148, ¶ 35. To invoke

estoppel against a municipality, the litigant must show (1) an affirmative act by either the municipality itself, such as legislation, or by an official with express authority to bind the municipality and (2) reasonable reliance upon that act by the litigant that induces a detrimental change in the litigant's position. *Id.* ¶ 40.

¶ 87    Consistent with these requirements, the Electoral Board made factual findings supporting the application of estoppel here. In relevant part, the Board unanimously found that (1) Schmidt was acting in her official capacity as the local election official and village clerk when she advised Jackson that the minimum signature requirement was 24 signatures, (2) Schmidt was acting in her official capacity when she advised Deputy Clerk Walters of the 24-signature requirement, and Walters shared that information with Pope, and (3) both Jackson and Pope relied on those official representations regarding the minimum 24-signature requirement and submitted an insufficient number of signatures.

¶ 88    In turn, a majority of the Electoral Board also found that Jackson's and Pope's reliance on Schmidt's inaccurate information about the signature requirement was reasonable and justified. In other words, the Electoral Board found the requisite factors for applying estoppel to the facts of this case. See, *e.g.*, *id.* (describing the elements for invoking equitable estoppel against a municipal entity).

¶ 89    Affording the Electoral Board's conclusions and findings the proper deference, I cannot say that the Electoral Board's application of estoppel to this case was "clearly erroneous" or that any of its factual findings were against the manifest weight of the evidence. See *Cinkus*, 228 Ill. 2d at 210 (detailing standard of review for reviewing an electoral board's factual findings and decisions involving mixed questions of fact and law).

¶ 90    In fact, it is clear that the mistakes in this case were made in good faith by individuals who believed the statutory minimum number of signatures was reduced because of restrictions, changes, and risks created by the COVID-19 pandemic. Jackson and Pope had a personal history with the village clerk, whom they both trusted from past experience.

¶ 91    Jackson, in particular, testified that she always received information on the minimum number of signatures from the village clerk and did not have any reason to question the clerk's calculation of the minimum number of signatures required.

- 27 -

Jackson and Pope both testified that they believed the lower number of required signatures related by the clerk was consistent with restrictions associated with the COVID-19 pandemic. Notably, this is not a case where the candidates relied on an errant statement from a random or unfamiliar municipal employee that was unsupported by the surrounding circumstances. As the appellate court aptly concluded, "the pandemic's extreme alterations of procedures and norms influenced this case and, as the pandemic is, hopefully, a once-in-a-lifetime event, similar circumstances are unlikely to arise again." 2021 IL App (2d) 210085-U, ¶ 34; see also *Patrick Engineering*, 2012 IL 113148, ¶ 35 (estoppel may apply against a municipality only under narrow circumstances).

¶ 92     The Electoral Board's decision is further supported by appellate court decisions that applied principles of estoppel in election cases with analogous situations. See *Merz*, 94 Ill. App. 3d at 1114, 1117 (applying estoppel to allow a candidate to remain on the ballot based on the candidate's reliance on incorrect information on signatures provided by a city clerk in an information sheet); *Atkinson*, 2013 IL App (2d) 130140, ¶ 19 (agreeing with *Merz* and applying estoppel to allow a candidate to remain on the ballot based on the candidate's reliance on incorrect information on signatures provided by a village clerk in a letter to the candidate); but see *Vestrup v. Du Page County Election Comm'n*, 335 Ill. App. 3d 156 (2002) (criticizing *Merz*'s application of estoppel).

¶ 93     The majority here essentially ignores the unique facts and circumstances presented in this case and finds that our decision in *Jackson-Hicks* is "controlling." *Supra* ¶ 35. The majority also overrules *Merz* and *Atkinson* based on a broad interpretation of *Jackson-Hicks*. With respect, I believe that the majority has misapplied that decision for a rather simple reason—*Jackson-Hicks* is not an estoppel case.

¶ 94     In stark contrast to this case, the election officials in *Jackson-Hicks* correctly calculated that 136 signatures were required for mayoral candidates in a 2015 consolidated election. *Jackson-Hicks*, 2015 IL 118929, ¶ 4. Further distinguishing that case, the candidate in *Jackson-Hicks* argued that "the Election Board was within its authority to allow his name on the ballot, notwithstanding his failure to obtain the statutorily required minimum number of signatures, because the statutory signature requirement is merely directory and not mandatory and substantial

compliance with the law's requirements will therefore suffice." *Id.* ¶ 22. And if there was any doubt of the different issue considered in *Jackson-Hicks*, this court plainly observed "that no possible claim of estoppel can be raised in this case." *Id.* ¶ 39.

¶ 95 Consequently, the focus of *Jackson-Hicks* was on whether "substantial reliance" or "close enough" was a proper standard when the candidate is apprised of the correct minimum number of signatures. We answered that question with a resounding "no"—concluding that "the minimum signature requirement imposed by section 10-3 of the Election Code (10 ILCS 5/10-3 (West 2012)) is mandatory and must be followed." *Id.* ¶ 42.

¶ 96 Admittedly, *Jackson-Hicks* appeared to express skepticism of *Atkinson* and *Merz* by citing favorably the appellate court's decision in *Vestrup* that disagreed with those decisions and reaffirmed the general principle that minimum signature requirements must be followed. *Id.* ¶¶ 23-25, 39-40. We did not, however, overrule either decision in *Jackson-Hicks*, as the majority acknowledges here. *Supra* ¶ 40.

¶ 97 Ultimately, I agree with the appellate court's thoughtful interpretation of *Jackson-Hicks*:

"[E]stoppel was not, in fact, before the court in *Jackson-Hicks*, and, therefore, its criticism was aimed at the appellate court having relied on [*Merz* and *Atkinson*] in the substantial-compliance case before it. Indeed, unlike here, there was no confusion in *Jackson-Hicks* over the required signature threshold; rather, the candidate simply did not obtain enough signatures. Moreover *** when the *Jackson-Hicks* candidate circulated petitions, there was no global pandemic impacting all aspects of life. Further, *Merz* and *Atkinson* [were not] overruled [in *Jackson-Hicks*], and we do not read *Jackson-Hicks* as barring the possibility of an estoppel argument in all election cases. Rather, we read it as essentially cautioning that, with respect to section 10-3's mandatory-signature requirements, estoppel will rarely, if ever, be appropriate." 2021 IL App (2d) 210085-U, ¶ 27.

In my opinion, the appellate court is correct—*Jackson-Hicks* should not be interpreted so broadly as to prohibit the application of estoppel permanently and completely in all election cases.

¶ 98         While I agree with the majority that estoppel against municipalities is generally disfavored (*Patrick Engineering*, 2012 IL 113148, ¶ 40), I cannot agree with the majority's draconian holding that estoppel can never apply under any circumstances in any election case. In my view, preserving estoppel in limited circumstances in election cases would better serve this court's historic recognition that a candidate's access to the ballot is a substantial right not lightly to be denied. *Bettis v. Marsaglia*, 2014 IL 117050, ¶ 28.

¶ 99         For these reasons, I agree with the conclusions of the Electoral Board, the circuit court, and the appellate court that estoppel should apply to the truly unprecedented circumstances presented in this case. I would affirm the Electoral Board's decision allowing Jackson and Pope to remain on the ballot as candidates for village president, and I dissent from the majority's decisions removing the two candidates from the ballot.

¶ 100        JUSTICE MICHAEL J. BURKE joins in this dissent.

¶ 101        JUSTICE NEVILLE took no part in the consideration or decision of this case.