2023 IL App (1st) 221692-U

No. 1-22-1692

Order filed September 15, 2023

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| EDWARD HUANG and KIM CHHAY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellees, | ) | Cook County |
| | ) | |
| v. | ) | No. 21 CH 6276 |
| | ) | |
| THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, | ) | |
| | ) | Honorable |
| | ) | David B. Atkins, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Mitchell and Justice Mikva concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse the judgment of the circuit court and affirm the decision of the Board of Education of the City of Chicago, the latter of which found that plaintiffs and their children were not residents of Chicago during various years in which they attended Chicago Public Schools and as a result, charged them non-resident tuition.

¶ 2    Following a residency hearing, the Board of Education of the City of Chicago (Board) adopted a report of an administrative hearing officer who found that plaintiffs Edward Huang (Huang) and Kim Chhay (Kim) (collectively, plaintiffs) were not residents of Chicago when Kim

enrolled three of her children, A.H., M.H. and S.H., in Chicago Public Schools (CPS) during the 2012-2013 to 2018-2019 school years. Because of this determination, the Board charged plaintiffs $105,186.49 in non-resident tuition. Thereafter, plaintiffs filed a complaint in the circuit court challenging that administrative decision, including through a writ of *certiorari*. The circuit court granted their writ of *certiorari* and reversed the Board's decision. The Board now appeals the circuit court's judgment, contending that it properly found plaintiffs were not residents of Chicago when Kim enrolled A.H., M.H. and S.H. in CPS and charged plaintiffs non-resident tuition. For the reasons that follow, we reverse the circuit court's judgment and affirm the Board's decision.

¶ 3                                  I. BACKGROUND

¶ 4     In September 2021, the Board informed plaintiffs that, following an investigation, it determined that they and their children, A.H., S.H., and M.H., had not been residents of Chicago while the children attended CPS. The Board asserted that non-resident pupils were prohibited from attending CPS under its rules, and under section 10-20.12a of the School Code (105 ILCS 5/10-20.12a (West 2020)), it was required to charge plaintiffs non-resident tuition for their children's attendance from the 2012-2013 school year through the 2019-2020 school year. The Board asserted that plaintiffs could owe it over $150,000 in non-resident tuition, though it would consider reducing that amount based upon their financial situation if they provided relevant financial information. Plaintiffs retained counsel and requested a hearing.

¶ 5                                  A. The Hearing

¶ 6     In October 2021, a hearing was held before a hearing officer designated by the Board. The evidence revealed that, in 2000, after getting married, Kim and Huang purchased a house in Skokie, which they continued to own jointly as of the date of the hearing (the Skokie residence).

They had four children: A.H., a female, who was born in 2002; S.H., a female, who was born in 2007; M.H., a male, who was born in 2011; and J.H., who never attended CPS.

¶ 7       In 2009, Huang began to attend medical school in the country of Dominca after working out an arrangement with his parents to move into their Skokie residence and help care for the children while Kim worked. As a result of being in medical school and related training, Huang lived in and out of Illinois for nearly a decade. Over time, the relationship between Huang's parents and Kim frayed resulting in Kim moving out of the Skokie residence in 2010 and into a house with her brother, Chung Chhay (Chung), her sister-in-law, Kendra Chhay (Kendra), and their two children on North Tripp Avenue in Chicago (the Tripp Avenue residence). Chung and Kendra had owned the residence together since 2009 and continued to do so as of the date of the hearing. Initially, according to Kim, she moved to the Tripp Avenue residence alone because she thought the move was just temporary to have her own "space" for a little while. But Kim testified that she stayed longer than anticipated. Kim and Kendra both testified that, in the summer of 2011, A.H., who was nine years old, moved to the Tripp Avenue residence to be with Kim.

¶ 8       In April 2012, Kim completed enrollment paperwork so that A.H. could attend fifth grade at Edison Regional Gifted Center, a CPS selective enrollment school, for the 2012-2013 school year. When completing enrollment paperwork, Kim used the Tripp Avenue residence as her and A.H's address. To support her Chicago residency, Kim included a copy of a lease agreement to the Tripp Avenue residence from the preceding year, which indicated that monthly rent was $1000 with electricity included. In 2014 and 2015, when Kim re-enrolled A.H. in Edison for seventh and eighth grade, respectively, Kim indicated that she, A.H. and Huang lived together at the Tripp Avenue residence. In March 2016, Kim completed an application to renew her driver's license and listed her residence as on Tripp Avenue in Chicago. Based on the application, it appears Kim's

previous driver's license, which was issued in June 2015, had the Skokie residence listed as her address. To this end, Kim's driver's license issued in March 2016 had the Tripp Avenue residence listed. So, too, did a direct deposit statement from Kim's employer in November 2016.

¶ 9    There was conflicting testimony about when precisely S.H. and M.H. moved to the Tripp Avenue residence. Kim, Huang and Kendra all testified to various timelines, but together, their testimony showed that S.H. and M.H. moved at some point between 2016 and 2019. Once M.H. and S.H. moved to the Tripp Avenue residence, there were three adults and five children, including Kendra's two children, living there. According to Kendra, Kim paid her $500 in monthly rent in cash, though Kendra did not have a copy of any lease agreement. On a direct deposit statement from Kim's employer in January 2017, her address was listed as being on Tripp Avenue.

¶ 10    In the summer of 2018, Kim completed enrollment paperwork so that M.H. could attend first grade at Beaubien Elementary School, an open enrollment CPS school with a gifted program for select students, for the 2018-2019 school year. When completing the paperwork, Kim used the Tripp Avenue residence as her and M.H.'s address. To support her Chicago residency, Kim included a June 2018 electricity bill from ComEd showing the account holder for the Tripp Avenue residence as "Tian E Huang," which was the legal name of Huang, as well the second installment property tax bill for 2017 for the Tripp Avenue residence showing the individual listed in connection with the residence's mailing address as "K Chhay." In addition, Kim filled out an application for school bus service for M.H. that listed the Tripp Avenue residence as his address.

¶ 11    According to Huang, in "late 2018," he returned to Illinois, began working as an infectious disease consultant and lived at the Skokie residence. When based in Illinois, Huang always lived at the Skokie residence. In the spring of 2019, Kim completed enrollment paperwork so that S.H. could attend sixth grade at Decatur Classical School, a CPS selective enrollment school, for the

2019-2020 school year. When completing the paperwork, Kim used the Tripp Avenue residence as her and S.H.'s address. To support her Chicago residency, Kim included a copy of an April 2019 electricity bill from ComEd showing the account holder for the Tripp Avenue residence as "K. Chhay" as well the first installment property tax bill for 2018 for the Tripp Avenue residence showing the individual listed in connection with the residence's mailing address as "K Chhay."

¶ 12    At some point during the spring of 2019, the Office of the Inspector General (OIG) for CPS began an investigation into Kim and Huang's residency. As part of the investigation, the OIG conducted surveillance on the Tripp Avenue and Skokie residences. The surveillance reports, all authored by investigator Demarkus Lee, were admitted into evidence. According to the first report, Lee conducted surveillance in the morning of May 17, 2019, on the Skokie residence, where he observed a blue Lexus, a blue Toyota, Huang, Kim, A.H., an "unknown school age boy" and an "unknown school age girl." Vehicle registration records were consistent with a Toyota and Lexus being registered to Kim and Huang at the Skokie residence and never to the Tripp Avenue residence. According to the second surveillance report, Lee conducted surveillance in the morning of June 5, 2019, on the Skokie residence, where he again observed the Lexus, Toyota, Huang, Kim, A.H. and an "unknown school age girl."

¶ 13    In July 2019, Kim received a new driver's license, which listed her residence as being on Tripp Avenue. Later that month, Kim and Huang purchased a house on North Sayre Avenue in Chicago which they continued to own jointly as of the date of the hearing (the Sayre Avenue residence). The warranty deed stated that the sellers of the residence sold the house to Kim and Huang "[h]usband and [w]ife, presently residing in Skokie." Huang testified that he decided to purchase the house on Sayre Avenue as a surprise to Kim and that she initially did not know about the purchase. Huang wanted to have a new, stable residence for Kim, A.H., M.H. and S.H. who,

according to him, had "been like nomad[s] moving around" and constantly under stress due to it. At one point during the hearing, Huang testified that Kim and their children were "intermittently" living at the Skokie and Tripp Avenue residences. However, at another point in his testimony, Huang asserted that Kim and the children lived full-time at the Tripp Avenue residence.

¶ 14    In August 2019, Kim completed enrollment paperwork so that M.H. could attend second grade at Decatur for the 2019-2020 school year, where she again listed her and M.H.'s address as the Tripp Avenue residence. As of the date of the hearing, M.H. and S.H. both continued to attend CPS selective enrollment schools. Meanwhile, A.H. attended Edison from fifth through eighth grade and then Northside College Prep, another CPS selective enrollment school, for high school, eventually graduating in 2020. J.H., Kim and Huang's other child, remained in Skokie with Huang and Huang's parents, where he attended public schools. At the hearing, Huang testified that, when he moved back to Illinois, he resided in Skokie despite Kim, A.H., M.H. and S.H. living at the Tripp Avenue residence because "Skokie definitely always [would] be my home." He added that he felt an obligation to care for his parents who relocated there and J.H., who had medical issues.

¶ 15    After purchasing the Sayre Avenue residence, Huang did not move in with Kim and their children. In fact, Kim, A.H., M.H. and S.H. only briefly moved into the house after the purchase. After Kim and the children moved in, Huang and Kim realized the house had various issues, including mold. These issues led to Kim, A.H., M.H. and S.H. moving out of the Sayre Avenue residence and back to the Skokie residence with Huang in the beginning of September 2019. Kim could not go back to the Tripp Avenue residence because Chung and Kendra were beginning to do work on their house. Although moving back to the Skokie residence was supposed to be temporary, COVID-19, a delay in obtaining a construction loan and more issues at the Sayre Avenue residence delayed their return.

¶ 16    In the fall of 2019, Sonia Fernandez, an assistant at Northside College Prep, observed that Kim paid for A.H.'s school fees using a check bearing a Skokie address, which was admitted into evidence. In another surveillance report, Lee conducted surveillance of the Skokie residence in January 2020, where he observed the Lexus. Lee observed an adult female, a teenaged female, a boy and a girl enter the Lexus and attempt to back out of the driveway. As the vehicle was backing out, Lee approached the driver, informed her that he was from CPS' OIG and asked if she was Kim, which she confirmed. Lee asked if her children were going to school to which Kim stated that she had arrived at the residence to take them to school.

¶ 17    In February 2020, Tracy Larson, OIG's chief investigator, interviewed Kim and Huang separately. According to Larson, Huang "gave varying stories" about where A.H., S.H. and M.H. lived. But, as of the date of the interview, Huang told Larson that the entire family lived in Skokie. In Kim's interview, she told Larson that she handled the enrollments for all of her children and that each time she enrolled them in CPS, she was living at the Tripp Avenue residence. During the interview, Larson asked Kim about her January 10, 2020, encounter with investigator Lee. Kim acknowledged not being truthful when she told Lee that she had arrived to the residence to take her children to school. During the hearing, Larson acknowledged that neither she nor any other investigators interviewed any of the family's Skokie neighbors or the Tripp Avenue neighbors to ask them about the family's living situation. During the same month as Larson's interviews, Kim received a direct deposit statement from her employer addressed to the Tripp Avenue residence.

¶ 18    At the hearing, Kim and Huang testified that the entire family lived in the Skokie residence while work remained ongoing at the Sayre Avenue residence. Despite owning that residence, Kim and Huang never planned to sell the Skokie residence because Huang's parents were living there.

¶ 19                                    B. Post-Hearing

¶ 20    Following the hearing, the hearing officer found that CPS proved by a preponderance of the evidence that neither Kim nor Huang were Chicago residents when their children attended CPS from the 2012-2013 through the 2019-2020 school years. Supporting this finding, the hearing officer observed that, when Kim completed enrollment paperwork for A.H. to attend Edison, she provided evidence of her Chicago residency with a lease agreement indicating that she lived at the Tripp Avenue residence and paid $1000 in monthly rent, which included electricity. The hearing officer, however, juxtaposed the lease agreement with Kendra's testimony where she stated that Kim paid her $500 in monthly rent in cash and she did not have a copy of any lease agreement. The hearing officer further observed that, when Kim completed enrollment paperwork for M.H. and A.H. to attend CPS, she provided evidence of her Chicago residency with tax bills and electricity bills showing either "K. Chhay" or "K Chhay" as the property owner or account owner. Given Kim's sister-in-law was named Kendra Chhay and there was no testimony indicating that Kim would be the property owner or account owner for the Tripp Avenue residence, the hearing officer concluded that "[i]t is more likely than not that Kim Chhay provided misleading documents to falsely establish residency at the Tripp [Avenue] address."

¶ 21    The hearing officer highlighted Huang's testimony of Kim and her children going "back and forth" between the Skokie and Tripp Avenue residences and concluded such actions were "likely *** [an] accurate description" of their travels "because Skokie was their home base." In determining Kim's intent as to her residence, the hearing officer determined that, when she enrolled her children in CPS, the Tripp Avenue residence was only "temporary" and she never established a permanent residency in Chicago. The hearing officer observed that there was no testimony that Kim brought any significant personal belongings or furniture to the Tripp Avenue residence and she retained checks bearing the Skokie address. The hearing officer found that

Skokie remained the permanent residence for the family, and that residency was never abandoned in favor of the Tripp Avenue residence, where Kim and the children would visit "when [Kim] needed a break from her mother-in-law." As it was more likely than not that Kim and Huang's residence was Skokie until they purchased the Sayre Avenue house in late July 2019, the hearing officer found that Kim provided "false information to CPS regarding her residence and the residence of her children" to enroll them in CPS through the 2019-2020 school year. According to the hearing officer, Kim "did this to have access to the selective schools in Chicago for her children that were not available to them as residents of Skokie."

¶ 22    Given the hearing officer found that Kim and Huang were not residents of Chicago until July 2019 when they bought the Sayre Avenue residence, the hearing officer determined that A.H. was never a resident of Chicago while attending CPS, and M.H. and S.H. only became residents of Chicago for the 2020-2021 school year. Because Kim provided the false information to CPS in enrollment paperwork, the hearing officer concluded she was obligated to pay non-resident tuition for her children's attendance in CPS during the years in which they were not Chicago residents.

¶ 23    Following the issuance of the hearing officer's report, plaintiffs filed various objections to it. At a November 2021 Board meeting, based on a recommendation from CPS' chief executive officer, the Board adopted the hearing officer's report. In relevant part, the Board concluded that plaintiffs were not residents of Chicago when their children were enrolled in CPS beginning in the 2012-2013 school year and continuing through the 2018-2019 school year and charged plaintiffs $105,186.49 in non-resident tuition for those years.[1] In addition, the Board rejected plaintiffs'

---

[1] Although the hearing officer concluded that S.H. and M.H. were not residents of Chicago during the 2019-2020 school year and the Board "adopted" the hearing officer's report, the Board's charge of tuition only included through the 2018-2019 school year.

objections, disenrolled M.H. and A.H. from their current schools, and prohibited them from attending any selective enrollment school or program in the future.

¶ 24    The following month, plaintiffs filed a complaint in the circuit court seeking review, in relevant part, through a common law writ of *certiorari* and requesting the Board's decision be reversed. Following briefing, the circuit court found that the Board's residency decision was clearly erroneous and observed that the Board never provided plaintiffs with a calculation of the amount of the non-resident tuition allegedly owed. The court accordingly granted plaintiffs' writ of *certiorari* and reversed the Board's decision. The Board timely appealed.

¶ 25                                II. ANALYSIS

¶ 26    In Illinois, it has long been the law that students who reside within a school district receive tuition-free education within that district. *Ashley v. Board of Education*, 275 Ill. 274, 278-81 (1916); *Jones v. Board of Education of City of Chicago*, 2013 IL App (1st) 122437, ¶ 24; see also 105 ILCS 5/10-20.12b(b) (West 2020). And in CPS, students must reside in Chicago in order attend its schools for free. Chicago Public School Rules, § 5-12. When a non-resident pupil attends CPS, "[t]he parent or legal guardian of a non-resident pupil determined to be in violation of this residency requirement shall be charged tuition as determined by the District's Department of Revenue, in accordance with the Illinois School Code." *Id.*; see also 105 ILCS 5/10-20.12b(b) (West 2020) ("[O]nly resident pupils of a school district may attend the schools of the district without payment of the tuition ***."). According to the School Code, a school district can charge a non-resident pupil "an amount not exceeding 110% of the per capita cost of maintaining the schools of the district for the preceding school year." 105 ILCS 5/10-20.12a(a) (West 2020). With these principles in mind, we address the parties' contentions on appeal.

¶ 27                                A. Residency

¶ 28    We begin with the Board's contention that the evidence presented at the hearing supported its finding that Kim and Huang were not residents of Chicago when Kim enrolled her children in CPS beginning in the 2012-2013 school year. Because Kim and Huang were not Chicago residents, the Board argues that its decision should be affirmed and the circuit court's judgment be reversed.

¶ 29    In this case, plaintiffs sought judicial review of the Board's decision pursuant to a complaint seeking review under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2020)) or a common law writ of *certiorari*. Generally, administrative decisions are reviewed under the Administrative Review Law (*id.*). When, as is the case here, an enabling statute does not adopt the Administrative Review Law or provide a method for reviewing decisions of an administrative agency, a writ of *certiorari* is an available method of review. *Hanrahan v. Williams*, 174 Ill. 2d 268, 272 (1996). Under such circumstances, the standards of review through a writ of *certiorari* "are essentially the same" as review under the Administrative Review Law. *Id.* Given this, we will follow the principles of review used under the Administrative Review Law. *Gwozdz v. Board of Education of Park Ridge-Niles School District No. 64*, 2021 IL App (1st) 200518, ¶ 29.

¶ 30    In administrative review, we review the decision of the administrative body, here the Board, rather than that of the circuit court. *Medponics Illinois, LLC v. Department of Agriculture*, 2021 IL 125443, ¶ 28. As neither party disputes that Huang was never a Chicago resident, this case turns on whether Kim was a resident of Chicago when she enrolled A.H., M.H. and S.H. in CPS selective enrollment schools or programs. The standard of review determines how much deference we afford the administrative agency's determination. *Id.* ¶ 29. The standard of review depends on whether the issue on appeal is a question of law, a question of fact, or a mixed question of law and fact. *Id.* The Board posits that we should review the issue of Kim's residency as a pure question of fact while plaintiffs assert it is a mixed question of law and fact. In the latter standard of review,

"the facts are admitted, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard or whether the rule of law is violated when applied to the established facts." *Id.* "The classic characterization of [mixed] questions [of law and fact] is one in which the underlying facts are established and *undisputed*." (Emphasis added.) *Mina ex rel. Anghel v. Board of Education for Homewood-Flossmoor*, 348 Ill. App. 3d 264, 272 (2004).

¶ 31    In the instant appeal, the parties very much dispute the facts, *i.e.*, Kim's residence when she enrolled her children in CPS, and thus, the issue on appeal is one of fact. See *Chaudhary v. Department of Human Services*, 2023 IL 127712, ¶ 95 (asserting an administrative agency's determination of residency "turned on a question of fact"). In such a question, an administrative agency's "factual findings are *prima facie* true and correct and will not be disturbed unless they are against the manifest weight of the evidence." *Id.* Factual findings will only be deemed against the manifest weight when the opposite conclusion is clearly evident. *Id.* We note, however, that even if the question on appeal was a mixed question of law and fact, and thus reviewed under the clearly erroneous standard of review (see *Corbin v. Schroeder*, 2021 IL 127052, ¶ 32), our ultimate conclusion would be the same.

¶ 32    As discussed, under section 10-20.12b(b) of the School Code, "only resident pupils of a school district may attend the schools of the district without payment of the tuition ***." 105 ILCS 5/10-20.12b(b) (West 2020). "The residence of a person who has legal custody of a pupil is deemed to be the residence of the pupil." *Id.* § 10-20.12b(a)(1). Relevant here, "[l]egal custody" means "[c]ustody exercised by a natural or adoptive parent with whom the pupil resides." *Id.* § 10-20.12b(a)(2)(i). This section of the School Code does not define "residence." See *Gwozdz*, 2021 IL App (1st) 200518, ¶ 32. Illinois courts often define residency as a person's physical presence in a location plus that person's intent to make the location his or her permanent residence. *Id.*

(citing *Miller v. Police Board of the City of Chicago*, 38 Ill. App. 3d 894, 897-98 (1976) (cases cited therein)). "However, our courts have long held that the term 'residence' for school district purposes is not limited to a parent's legal domicile." *Id.* Residency to attend a school is not akin to what is "required to establish a right to vote, or which would fix the liability of a township or county for the support of a pauper." *Ashley*, 275 Ill. at 278. "The right to attend school is not limited to the place of the legal domicile," and "[a] residence, even for a temporary purpose, in a school district, is sufficient to entitle children of school age to attend school." *Id.* "The only requirement, so far as residence is concerned, is dwelling in the school district." *Id.* at 279. And thus, "[t]he establishment of such a residence, even for a temporary purpose, is sufficient to entitle children to attend school in the district" as long as that temporary residence was not established solely for the purpose of attending school for free. *Gwozdz*, 2021 IL App (1st) 200518, ¶ 35. As such, "when determining one's residence for school district purposes we consider not only the dwelling place of the family, but also whether that place is the family's intended 'home base' for day to day living and care of the child." *Gwozdz*, 2021 IL App (1st) 200518, ¶ 40.

¶ 33 Before reviewing the Board's findings, in which it "adopted" the hearing officer's report, we must point out that the hearing officer concluded that Kim, Huang and their children were not Chicago residents from the 2012-2013 school year through the 2019-2020 school year. The hearing officer found that they only became residents in the 2020-2021 school year for selective enrollment school purposes based on their late July 2019 purchase of the Sayre Avenue residence. See Chicago Public Schools Policy, § 602.2(VII)(4) (for purposes of enrolling in selective enrollment schools, a student must be a Chicago resident no later than July 1 of the upcoming school year). Yet, the Board only charged plaintiffs non-resident tuition through the 2018-2019 school year. Thus, this

appeal does not concern any evidence or factual findings relevant to the 2019-2020 school year and beyond.

¶ 34     Based on the evidence presented at the hearing, the hearing officer's residency finding, as adopted by the Board, was not against the manifest weight of the evidence. Although the hearing officer never explicitly made a credibility finding concerning Kim's testimony, the hearing officer implicitly found her testimony not credible. First, at the hearing, Kim described where she and her children lived at various times and was adamant about living full-time at the Tripp Avenue residence during the relevant time periods. However, the hearing officer found Huang's testimony about Kim and the children going back and forth between the Skokie and Tripp Avenue residences, which contradicted Kim's testimony, more accurately described the family's relationship between the residences. By finding Huang's description of the family's travels the more credible version, the hearing officer necessarily rejected Kim's version and found it not credible. Second, the hearing officer concluded it was likely that Kim submitted misleading documentation to CPS to support her claimed Chicago residency, which implicitly tainted her testimony on the matters during the hearing. Thus, despite no express credibility finding as to Kim, the hearing officer undeniably did not find her testimony credible. In review of an administrative decision, we defer to the credibility findings of the hearing officer. See *Mina*, 348 Ill. App. 3d at 276. Although, as plaintiffs note, such deference is not "boundless" (*Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 507 (2007)), the evidence fully supports the hearing officer's determination that Kim was not credible about where she lived during the time periods in question.

¶ 35     When Kim submitted enrollment paperwork for A.H., M.H. and S.H. to attend CPS, she supported her Chicago residency with deceptive, if not outright fraudulent, documentation. When she submitted enrollment paperwork for A.H. to attend CPS for the 2012-2013 school year, Kim

provided a copy of a lease agreement to the Tripp Avenue residence with her, though named as "Kim Huang," listed as the tenant and "Chung Chay," presumably her brother, though listed as a Skokie resident, as the lessor. The lease stated the monthly rent was $1000. But this purported lease agreement was inconsistent with Kendra's testimony, where she stated she did not have any copy of a lease agreement and Kim paid her $500 in monthly rent. Additionally, when Kim submitted enrollment paperwork for M.H. and S.H. to attend CPS for the 2018-2019 and 2019-2020 school years, respectively, Kim provided tax bills and ComEd bills listing "K Chhay," "K. Chhay" and Huang in connection with the Tripp Avenue residence. However, there was no evidence, or reasonable inferences therefrom, to explain why Kim or Huang's name would be associated with the Tripp residence in this manner. Huang indisputably never lived there, and there was no indication that Kim would have been responsible for the residence's electricity or its property taxes. Rather, the evidence points to the "K. Chhay" or "K Chhay" on these bills as being Kendra, Kim's sister-in-law, and Kim using this to her benefit when enrolling M.H. and S.H. in CPS. Notably, on appeal, Kim and Huang never attempt to provide any explanation for these irregularities or dispute the inferences from them that Kim lied in the enrollment paperwork. Furthermore, during the hearing, Kim testified that the Tripp Avenue residence contained three bathrooms yet property records indicated that it only had one. Lastly, during Kim's interview with Larson, Kim conceded that she lied to investigator Lee when he approached her at the Skokie residence in the morning of January 10, 2020. Based on the foregoing, the hearing officer rationally concluded that Kim was not a credible witness.

¶ 36    Given the hearing officer's rejection of Kim's version of her and her family's residency, we are left with Huang's versions, one of which the hearing officer found the most accurate description of the family's travels. At the hearing, Huang testified to various versions of where

Kim and their children lived. At one point, Huang explained that Kim and the children were "nomad[s]" moving back and forth between the Skokie and Tripp Avenue residences. At another point, he asserted that Kim and the children lived full-time at the Tripp Avenue residence. On one hand, it is unreasonable to expect Huang to know exactly where Kim and the children were living at various points because he was living outside of Illinois for large periods of time for his medical training when compared to Kim's testimony, who was undeniably more present with the children. But, because in administrative review, the hearing officer is the finder of fact, she has the responsibility to weigh the evidence and resolve any inconsistencies within that evidence. *Jackson v. Board of Education of City of Chicago*, 2016 IL App (1st) 141388, ¶ 26. And despite Huang testifying that Kim and the children lived full-time at the Tripp Avenue residence during part of his testimony, the hearing officer properly rejected that assertion in favor of Huang's other testimony where he indicated that Kim and the children were nomadic. See *id.* We cannot substitute our judgment in for that of the hearing officer on such a finding. See *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). And thus, taking all of the evidence at the hearing in account, the hearing officer found no intent by Kim or Huang to reside in Chicago on a day-to-day basis. See *Gwozdz*, 2021 IL App (1st) 200518, ¶ 40 ("[W]hen determining one's residence for school district purposes we consider not only the dwelling place of the family, but also whether that place is the family's intended 'home base' for day to day living and care of the child.").

¶ 37     This ultimate finding was amply supported by the evidence. See *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 534 (2006) ("So long as the record contains evidence supporting the agency's decision, that decision should be affirmed."). First, prior to March 2016, Kim's driver's license showed she lived in Skokie, and as of August 2019, her checks

bore the Skokie address. There were also the family's vehicle registration records which showed a Toyota and Lexus registered to the Kim and Huang in Skokie during the time Kim said she was living at the Tripp Avenue residence. Furthermore, in surveillance reports from two mornings in May and June 2019—before Huang and Kim bought the Sayre Avenue residence and when Kim claimed she was living at the Tripp Avenue residence—OIG investigator Lee observed Kim, Huang. A.H., a "school age boy" (one time) and a "school age girl" (both times) at the Skokie residence. When Kim and Huang eventually purchased the Sayre Avenue residence, the warranty deed stated that they both "presently resid[ed] in Skokie." These acts hold more weight than Kim's testimony. See *Mina*, 348 Ill. App. 3d at 275 ("In determining intent, a person's acts are to be given more weight than her declarations"). Although there was some evidence indicating that Kim did reside at the Tripp Avenue residence, such as her direct deposit statements from November 2016 and January 2017, her driver's license from March 2016 onward, and her application for bus service for M.H., the hearing officer, as the trier of fact, had the responsibility of resolving the inconsistencies in the evidence (see *Jackson*, 2016 IL App (1st) 141388, ¶ 26) and appropriately did so against Kim. "The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). Thus, the hearing officer properly concluded that Kim and her family were not Chicago residents when she enrolled her children in CPS beginning in the 2012-2013 school year through the 2018-2019 school year.

¶ 38    In making this residency determination, the hearing officer essentially concluded that Skokie was the family's home base and that any living at the Tripp Avenue residence was temporary and for the sole purpose of attending CPS schools for free. See *Gwozdz*, 2021 IL App

(1st) 200518, ¶ 35 (observing "[t]he establishment of such a residence, even for a temporary purpose, is sufficient to entitle children to attend school in the district" as long as "the temporary residence was not established for the sole benefit of attending free schools"). Given the hearing officer's findings, which were amply supported by the evidence, the opposite conclusion, *i.e.*, that Kim, Huang and their children were Chicago residents during the relevant time periods, is not clearly evident. Consequently, the determination by the Board, which adopted the hearing officer's report, that Kim, Huang and their children were not Chicago residents for the 2012-2013 to 2018-2019 school years was not against the manifest weight of the evidence. See *Chaudhary*, 2023 IL 127712, ¶ 95.

¶ 39    Nevertheless, plaintiffs devote a significant portion of their brief to discussing who had the ultimate burden of proof at the hearing and asking us to carefully dissect the circuit court's finding on the burden of proof. Initially, because we review the decision of the Board, not the circuit court, the court's findings are irrelevant to this appeal. See *Medponics*, 2021 IL 125443, ¶ 28. As to the burden of proof issue itself, regardless of which party had the ultimate burden of proof, there was sufficient evidence presented by CPS, much of which we have discussed, to sustain its burden, if it had the ultimate burden of proof.

¶ 40    Moreover, plaintiffs claim that the Board's evidence was circumstantial and lacked foundation. However, plaintiffs cite no case law establishing that an administrative determination cannot be made using circumstantial evidence. In fact, the opposite is true. See *Letourneau v. Department of Registration & Education*, 212 Ill. App. 3d 717, 726 (1991) ("An administrative agency may properly base its decision on circumstantial evidence."). And despite plaintiffs' claim that the Board's evidence was without foundation, plaintiffs never explain which of the Board's copious exhibits lacked the proper foundation, thus forfeiting the argument. See Ill. S. Ct. R.

341(h)(7) (eff. Oct. 1, 2020). Moreover, plaintiffs' attorney stipulated to the admission of nearly every exhibit presented by CPS, and they never raised an objection based on foundation during the administrative hearing. See *Wortham v. City of Chicago Department of Administrative Hearings*, 2015 IL App (1st) 131735, ¶ 15 (argument not raised in an administrative hearing cannot be raised for the first time on review). Consequently, the Board properly determined that Huang, Kim and their children were not Chicago residents from the 2012-2013 through the 2018-2019 school years.

¶ 41                                           B. Tuition

¶ 42    After the Board properly determined that Huang, Kim and their children were not Chicago residents from the 2012-2013 through the 2018-2019 school years, it charged plaintiffs $105,186.49 in non-resident tuition for that time period. While the Board argues that we should reinstate that charge given that its residency determination was proper, plaintiffs posit that the Board failed to provide an adequate record from which this court can determine that its requested tuition reimbursement was valid. To this end, plaintiffs assert that, because the Board failed to present any evidence during the administrative hearing as to how the tuition reimbursement amount was calculated, we should declare the Board's claim for it null and void.

¶ 43    As discussed, when a non-resident pupil attends CPS, his or her parent can be charged non-resident tuition at "an amount not exceeding 110% of the per capita cost of maintaining the schools of the district for the preceding school year." 105 ILCS 5/10-20.12a(a), 10-20.12b (West 2020); Chicago Public School Rules, § 5-12.

> "Such per capita cost shall be computed by dividing the total cost of conducting and maintaining the schools of the district by the average daily attendance, including tuition pupils. Depreciation on the buildings and equipment of the schools of the district, and the amount of annual depreciation on such buildings and

equipment shall be dependent upon the useful life of such property." 105 ILCS

5/10-20.12a(a) (West 2020).

If a non-resident pupil only attends school for a portion of the year, his or her tuition is apportioned

accordingly. *Id.*

¶ 44 It is true, as plaintiffs highlight, that the Board never provided them a line-item

computation as to how it determined that they owed $105,186.49 in non-resident tuition. But in

the Board's initial notice letter asserting it had determined that plaintiffs and their children were

not residents of Chicago, it cited section 10-20.12a of the School Code (*id.* § 10-20.12a) for the

proposition that it was required to charge them non-resident tuition. Moreover, in that letter, the

Board indicated that plaintiffs could owe over $150,000 in non-resident tuition, but stated that it

would consider reducing that amount based upon their financial situation as long as they provided

relevant financial information to the Board. There is no evidence that plaintiffs attempted to do so.

Further, despite filing five pages worth of objections following the administrative hearing, none

of those objections involved anything related to the Board not providing them a line-item

computation of the non-resident tuition charge. By failing to raise this issue during the

administrative proceedings, they have forfeited the issue here on administrative review. See

*Wortham*, 2015 IL App (1st) 131735, ¶ 15.

¶ 45 Forfeiture aside, the sections of the School Code detailing the tuition of non-resident pupils

contain no requirement for the Board to provide a detailed calculation of the non-resident tuition

owed. See 105 ILCS 5/10-20.12a; 10-20.12b(c-5) (West 2020). The only requirement is that, prior

to a potential hearing, the Board "notify the person who enrolled the pupil of the amount of the

tuition charged under Section 10-20.12a [of the School Code] that is due to the district for the

nonresident pupil's attendance." *Id.* § 10-20.12b(c-5). Moreover, following a hearing conducted

by a hearing officer, the Board must "decide whether or not the pupil is a resident of the district and the amount of any tuition required to be charged under Section 10-20.12a [of the School Code] as a result of the pupil's attendance in the schools of the district." *Id.* The Board has no other relevant statutory requirements in providing notice about the non-resident tuition owed. Because the Board met its statutory requirements in providing plaintiffs the amount of non-resident tuition owed and plaintiffs did not challenge the lack of a detailed calculation during the administrative proceedings, the Board properly charged plaintiffs $105,186.49 in non-resident tuition.

¶ 46 Furthermore, because the evidence revealed that M.H. and S.H. were enrolled in selective enrollment schools in violation of CPS' residency requirement (see Chicago Public Schools Policy, § 602.2(VII)(4)), the Board properly disenrolled them from their schools and banned them permanently from future enrollment in such schools (see *id.* §§ 602.2(VII)(3); 602.2(XIII)), actions that plaintiffs do not dispute if the Board's residency determination was proper.

¶ 47                                    C. Due Process

¶ 48 Lastly, Huang and Kim posit that the hearing process deprived them of their right to due process because both the hearing officer and the Board had a financial interest in the outcome of the case. Concerning the hearing officer, although plaintiffs concede the record is devoid of any evidence indicating who paid her fees, they posit that her selection as hearing officer by the Board on its own raises the appearance of impropriety. Concerning the Board, plaintiffs assert that it is undisputed that any monies recovered from them for non-resident tuition would be returned to its bank account, thus demonstrating a direct pecuniary interest.

¶ 49 Principles of due process apply to administrative hearings *Girot v. Keith*, 212 Ill. 2d 372, 380 (2004). The parties to an administrative hearing are guaranteed the right to an impartial and fair tribunal. *Id.* If an agency decision-maker is biased, a hearing cannot be impartial "and the

process is constitutionally impermissible-even if the agency's procedures and rules are acceptable." *Emergency Treatment, S.C. v. Department of Employment Security*, 394 Ill. App. 3d 893, 907 (2009). But there is a presumption that agency administrators and hearing officers are honest and act with integrity, " 'capable of judging a particular controversy fairly on the basis of its own circumstances.' " *Scott v. Department of Commerce & Community Affairs*, 84 Ill. 2d 42, 55 (1981) (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941)). We review plaintiffs' due process claim *de novo*. *Emergency Treatment*, 394 Ill. App. 3d at 907.

¶ 50    In the instant case, plaintiffs posit that the mere fact the Board selected the hearing officer demonstrates bias on her part and the mere fact that monies recovered from them for non-resident tuition would be returned to the Board's bank account demonstrates bias on the Board's part. However, such an assertion amounts to nothing more than "the mere possibility of bias," speculation which is insufficient to show that an administrative adjudication was unfair. *Grissom v. Board of Education of Buckley-Loda Community School District No. 8*, 75 Ill. 2d 314, 321 (1979). Without more, plaintiffs' due process claim fails.

¶ 51                              III. CONCLUSION

¶ 52    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and affirm the decision of the Board.

¶ 53    Circuit court judgment reversed; Board decision affirmed.